1  WILLIAM J. FLYNN, Cal. Bar No. 95371
   SCOTT M. DE NARDO, Cal. Bar No. 216749
2  NEYHART, ANDERSON, FLYNN & GROSBOLL
   44 Montgomery Street, Suite 2080
3  San Francisco, CA 94104
   TEL: (415) 677-9440
4  FAX: (415) 677-9445
   Email: sdenardo@neyhartlaw.com
5
   Attorneys for Plaintiffs
6



*ORIGINAL FILED*

*JUN 12 2008*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

*E-filing*

*JCS*

7              **UNITED STATES DISTRICT COURT**

8          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10  ELECTRICAL INDUSTRY SERVICE        ) Case No. CV 08 2929
    BUREAU, INC.; NORTHERN CALIFORNIA  )
11  ELECTRICAL WORKERS PENSION TRUST;  )
    SAN FRANCISCO COUNTY ELECTRICAL    )     **COMPLAINT;**
12  INDUSTRY APPRENTICESHIP AND        )     **REQUEST FOR INJUNCTIVE**
    TRAINING TRUST; ELECTRICAL         )     **RELIEF; AND, REQUEST FOR JURY**
13  WORKERS HEALTH AND WELFARE         )     **TRIAL**
    TRUST; NATIONAL ELECTRICAL         )
14  BENEFIT FUND; INTERNATIONAL        )
    BROTHERHOOD OF ELECTRICAL          )
15  WORKERS LOCAL 6 VACATION FUND;     )
    INTERNATIONAL BROTHERHOOD OF       )
16  ELECTRICAL WORKERS LOCAL 6; JOHN   )
    O'ROURKE, as Trustee of each of the Plaintiff )
17  Trust Funds except the National Electrical )
    Benefit Fund and the Electrical Industry Trust; )
18  and TOM COLEMAN as Trustee of each of the )
    Plaintiff Trust Funds except the National  )
19  Electrical Benefit Fund and as agent for Plaintiff )
    National Electrical Benefit Fund,          )
20                                             )
           Plaintiffs,                         )
21                                             )
        vs.                                    )
22                                             )
    SOUTHEAST ELECTRICAL                       )
23  CONTRACTORS, a sole proprietorship; and,   )
    JAMES ARTHUR RICHARDS, its owner,          )
24                                             )
           Defendants.                         )
25  _____ )

26

27

28

---

**COMPLAINT; REQUEST FOR INJUNCTIVE RELIEF; AND, REQUEST FOR JURY TRIAL**                    0
Case No.

Plaintiffs allege:

I.

## COMMON FACTUAL ALLEGATIONS

1.    <u>Jurisdiction</u>. This is an action to collect unpaid contributions to multi-employer benefit plans pursuant to the terms of each plan and a collective bargaining agreement and compel an audit pursuant to the terms of each plan and a collective bargaining agreement. Jurisdiction is pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), (e) and (g), 29 U.S.C. § 1145 and the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. Jurisdiction also exists pursuant to 28 U.S.C. § 1331.

2.    <u>Venue</u>. Venue is appropriate in this District as the Plaintiff Trusts are administered here (in San Francisco County) and the breach took place in this district (in San Francisco County); 29 U.S.C. § 1132(e)(12).

3.    Plaintiff INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 6, hereinafter referred to as the "Union" or "Local 6", is a labor union and the collective bargaining agent for electricians and apprentice electricians employed by Defendants.

4.    Plaintiffs NORTHERN CALIFORNIA ELECTRICAL WORKERS PENSION TRUST ("Pension Trust"), SAN FRANCISCO COUNTY ELECTRICAL INDUSTRY APPRENTICESHIP AND TRAINING TRUST ("Apprenticeship Trust"), ELECTRICAL WORKERS HEALTH AND WELFARE TRUST ("Health and Welfare Trust"), NATIONAL ELECTRICAL BENEFIT FUND ("NEBF"), and INTERNATIONAL BROTHERHOOD FO ELECTRICAL WORKERS LOCAL 6 VACATION FUND ("Vacation Fund") will be collectively referred to as the "Trusts". Each of the Trusts, except the Vacation Fund, are multi-employer employee benefit plan pursuant to ERISA, 29 U.S.C. § 1002(3), (37) and 29 U.S.C. § 1132(d)(1) and each is a jointly trusteed employee benefit trust pursuant to the LMRA, 29 U.S.C. § 186(c)(5). Employers make contributions to the Trust pursuant to the requirements of their collective

bargaining agreements with Plaintiff LOCAL 6 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO.

5.     Plaintiff ELECTRICAL INDUSTRY SERVICE BUREAU, INC. ("EISB") is the designated collection agent for each of the Trusts.  The Defendants are required to make contributions to EISB which then distributes the amounts paid to the various Trusts.  The Vacation Fund is a method of deducting employee wages for a vacation and holiday savings account.  The contributions are made from deductions from the employee's wages.  These deductions are paid into EISB who then credits the amounts to the individual vacation and savings accounts of each employee.

6.     Plaintiff JOHN O'ROURKE is a trustee and fiduciary of each Trust, except NEBF, and the Business Manager of Local 6.  Plaintiff TOM COLEMAN is a trustee of each of the ERISA funds except NEBF.  Mr. Coleman has been designated NEBF's local agent.  As such, Mr. O'Rourke and Mr. Coleman are fiduciaries of the Trusts within the meaning of ERISA § 402, 29 U.S.C. § 1102.  As Trustees, Mr. O'Rourke and Mr. Dickson have the duty, jointly exercised with the other Trustees of those funds, to administer the trusts for the exclusive benefit of the covered employees in accordance with the applicable law, the terms of each of the Trusts' written Trust Agreements and the collective bargaining agreement.  That fiduciary duty included the collection of unpaid employer contributions.

7.     Defendants SOUTHEAST ELECTRICAL CONTRACTORS (hereinafter referred to as "Southeast Electric") and its owner JAMES ARTHUR RICHARDS agreed to be bound to the terms and conditions of a collective bargaining agreement with the Plaintiff INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 6 (hereinafter referred to as "Local 6" or the "Union").  (Attached hereto as Exhibit "A" is a true and correct copy of a "Letter of Assent – A", binding Southeast Electric to the I.B.E.W. Local 6/N.E.C.A. Inside Agreement.  Attached hereto as Exhibit "B" is a true and correct copy of the current Inside Agreement between the San Francisco

Electrical Contractors Association, Inc. ("SFECA") and the Local 6 of the International Brotherhood of Electrical Workers ("I.B.E.W.")). The collective bargaining agreement requires the Defendants to make monthly contributions to the Trust for fringe benefits for covered employees. The respective collective bargaining agreements also require the Defendants to be bound to the applicable Trust agreements. The respective collective bargaining agreements and/or related Trust agreements also specify that Defendants submit to a payroll audit to determine the completeness and accuracy of contribution reporting. (Attached hereto as Exhibit "C" is a true and correct copy of the Joint Billing and Administrative Services Agreement for Related Entities in the San Francisco Electrical Industry which specifies the collection and audit procedures of the signatory Trusts, this copy is unsigned; however, each of the relevant Trusts are signatory to or have otherwise adopted this Agreement).

8.    Defendant Southeast Electric is a sole proprietorship believed to have a California contractor's license #461014. Defendant Southeast Electric and Defendant JAMES ARTHUR RICHARDS, its owner, are alter-egos and/or agents of one another and fiduciaries of the Trusts pursuant to 29 U.S.C. § 1145, et seq and will be collectively referred to as the "Defendants" unless otherwise stated. Defendants are engaged in the installation and testing of electrical wiring and electrical circuits business in San Francisco County, California. Plaintiffs are informed and reasonably believe that the Defendants are a fiduciary of the Trust pursuant to 29 U.S.C. § 1145, et seq.

9.    At all times material herein, the Defendants have engaged in the construction industry in California and as such has been an "employer" "engaged in an industry or activity affecting commerce" within the meaning of 29 U.S.C. § 152 and 29 U.S.C. §§ 1002-1003.

10.    The Defendants have failed to submit to an audit of its payroll records in accordance with the applicable collective bargaining agreement and/or Trust agreements. As a result, it is believed that the Defendants have repeatedly underpaid or not paid the required contributions to the plans during the period of the statute of limitations. Furthermore, within the appropriate statutory

1  period, the Defendants have not submitted the monthly transmittals of employee hours & employer

2  contributions based upon those hours reported pursuant to the appropriate collective bargaining

3  agreement and/or Trust agreements.

4

5        11.    Under the terms of the Trust Agreements to which the Defendants have agreed to be

6  bound, an employer who fails to make timely contributions to the Trust for employee fringe benefits

7  is liable to the Trust for all unpaid contributions, liquidated damages of ten percent (20%) of the

8  principal amount, twelve percent (12%) interest on the unpaid principal, as well as attorneys' fees

9  and collection costs.

10                      II.

11                FIRST CLAIM

12          (Request for Audit Order)

13

14        12.    Plaintiffs incorporate by reference and reallege paragraphs 1-11 as if set out in full.

15        13.    <u>Jurisdiction</u>.  Jurisdiction is pursuant to ERISA, 29 U.S.C. §§ 1132(a)(3) as this is a

16  request to enforce provisions of various employee benefit plans and a collective bargaining

17  agreement.

18        14.    The collective bargaining agreement and/or the applicable Trust agreements require

19  all employers, upon request, to submit to an audit by auditors for the Trusts.

20

21        15.    Defendants have avoided all requests for audits.

22        16.    Plaintiffs are entitled to an order requiring an audit and an order requiring all unpaid

23  contributions liquidated damages and pre-judgment interest revealed from any such audit.

24

25

26

27

28

III.

## SECOND CLAIM

(ERISA - 29 U.S.C. § 1145)

17.    Plaintiffs incorporate by reference and reallege paragraphs 1-11 and 13-16 as if set out in full.

18.    Jurisdiction.  This is an action to require an employer to submit to a payroll audit and to collect unpaid contributions found owing to multi-employer benefit plans and to submit missing monthly employer transmittals pursuant to the terms of each plan, Trust agreement and the collective bargaining agreement.  Jurisdiction is pursuant to ERISA, 29 U.S.C. §§ 1132(a), (e) and (g) and § 1145.

19.    The Defendants' action constitutes a failure of an employer to submit monthly transmittals and make contributions to a multi-employer plan, as well as a breach of fiduciary duty owed pursuant to 29 U.S.C. § 1145.

20.    Plaintiffs are entitled to judgment for all unpaid contributions, liquidated damages, prejudgment interest and reasonable attorneys fees and costs pursuant to 29 U.S.C. § 1132(g)(2).

IV.

(LMRA)

21.    Plaintiffs incorporate by reference and reallege paragraphs 1-11, 13-16 and 18-20 as if set out in full.

22.    Jurisdiction.  This is an action to enforce a collective bargaining agreement pursuant to 29 U.S.C. § 185(a).

23.    The Defendants' failure to pay contributions and submit monthly employer contribution transmittals owing breached the agreement between the Defendants and the union to the detriment of the Plaintiffs and Plaintiffs are entitled to damages, liquidated damages, interest, attorneys' fees and costs pursuant to the agreement.

**COMPLAINT; REQUEST FOR INJUNCTIVE RELIEF; AND, REQUEST FOR JURY TRIAL**    5
Case No.

V.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray judgment as follows:

1. For an Order granting Plaintiffs' auditors access to all of Defendants' payroll and other business records required for the successful completion of an audit pursuant to the terms of the applicable collective bargaining agreement and/or Trust agreements.

2. For an Order compelling production of missing monthly employer contribution transmittals that Defendants have failed to submit, currently believed to be for the months of December 2007 through the present and other months, according to proof,

3. For any unpaid principal owed encompassing the time period of the audit, as well as any other unknown unpaid principal amounts owed on the missing transmittals from December 2007 through the present and further unknown amounts according to proof,

4. For liquidated damages and prejudgment interest associated with the Defendants' delinquencies resulting from late and/or non- reporting encompassing the time period of the audit through the present, as well as unknown additional amounts of liquidated damages and interest owed on the missing transmittals from December 2007 through the present, and any further amounts according to proof,

5. For such equitable relief as this court deems just and proper,

6. For reasonable attorneys fees and costs of suit (currently estimated to be approximately $4,000.00), according to proof, and;

7. For such other and further relief as this court deems just and proper.

Dated: June 7, 2008                     Respectfully submitted,

                                        _____
                                        Scott M. De Nardo
                                        NEYHART, ANDERSON, FLYNN & GROSBOLL
                                        Attorneys for Plaintiffs

---

COMPLAINT; REQUEST FOR INJUNCTIVE RELIEF; AND, REQUEST FOR JURY TRIAL          6
Case No.

## JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury.

Dated:  June 9, 2008.

Scott M. De Nardo
Attorney for Plaintiffs

EXHIBIT A

# LETTER OF ASSENT - A

In signing this letter of assent, the undersigned firm does hereby authorize [1] San Francisco Electrical

Contractors Association, Inc. _____ as its collective bargaining representative for all matters contained in or pertaining to the

current and any subsequent approved [2] _____ Inside _____ labor agreement between the

[1] San Francisco Electrical Contractors Assn., Inc. _____ and Local Union [3] 6 , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the [4] 24th day of

February _____ 2006 . It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1] San Francisco Electrical Contractors Assn., Inc. _____ and to the Local Union at least one hundred

fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors' Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

## SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

SOUTHEAST ELECTRICAL CONTRACTORS
[1] Name of Firm

1767  Oakdale Avenue
Street Address/P.O. Box Number
San Francisco, CA 94124
City, State (Abbr.) Zip Code

[6] Federal Employer Identification No.: #94-29-51891

> APPROVED
> INTERNATIONAL OFFICE - I.B.E.W.
>
> MAR 1 3 2006
>
> Edwin D. Hill, President
> This approval does not make the
> International a party to this agreement.

SIGNED FOR THE EMPLOYER                     SIGNED FOR THE UNION [3] 6 , IBEW

BY [7] James Richards                       BY [7] John J. O'Rourke
    (original signature)                        (original signature)

NAME [8] James Richards                      NAME [8] John J. O'Rourke

TITLE/DATE OWNER / 2/24/06                    TITLE/DATE Business Manager-Financial Secretary

### INSTRUCTIONS (All items must be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
Insert type of agreement. Example: Inside, Outside Utility, Outside Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree Trimming, etc. The Local Union must obtain a separate assent to each agreement the employer is assenting to.
[3] LOCAL UNION
Insert Local Union Number.
[4] EFFECTIVE DATE
Insert date that the assent for this employer becomes effective. Do not use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
Insert the identification number which must appear on all forms filed by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
Print or type the name of the person signing the Letter of Assent.
International Office copy must contain actual signatures-not reproduced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING. AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCAL UNION SHALL RETAIN ONE COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.
IMPORTANT: These forms are printed on special paper and no carbon paper is required for duplicate copies. Remove from the pad enough copies of the form for a complete set and complete the form.

IBEW FORM 302 REV. 6/94

EXHIBIT B

RECEIVED

JAN 2 2 2007

Neyhart, Anderson,
Flynn & Grosboll





# INSIDE AGREEMENT

Between

LOCAL  UNION  6

INTERNATIONAL BROTHERHOOD OF

ELECTRICAL WORKERS

SAN FRANCISCO, CALIFORNIA

and

THE SAN FRANCISCO

ELECTRICAL CONTRACTORS

ASSOCIATION, INC.

June 1, 2005 - May 31, 2009

# INDEX

## to

# INSIDE WIREMEN'S AGREEMENT

Page No.

AGREEMENT
BASIC PRINCIPLES — SCOPE ............................................. 1-2

ARTICLE I        EFFECTIVE DATE — CHANGES
TERMS OF THE AGREEMENT
TERMINATION — DISPUTES .............................................. 2-5

ARTICLE II       ASSOCIATION/EMPLOYER'S RIGHTS
UNION RIGHTS ............................................................ 5-10

ARTICLE III      REFERRAL PROCEDURE —
UNION SECURITY ......................................................... 11-14

ARTICLE IV       HOURS, WAGE PAYMENT, APPRENTICES,
WORKING CONDITIONS .................................................. 15-27

ARTICLE V        APPRENTICESHIP .................................... 28-32

ARTICLE VI       FRINGE BENEFITS — CONTRIBUTIONS ...... 33-42

ARTICLE VII      VARIABLE PENSION CONTRIBUTION ......... 42-45

ARTICLE VIII     SEPARABILITY CLAUSE........................... 45

# AGREEMENT
## INSIDE WIREMEN

Agreement by and between the San Francisco Electrical Contractors Association, Inc., and Local Union 6, I.B.E.W.

It shall apply to all firms who sign a letter of assent to be bound by this Agreement.

As used hereinafter in this Agreement, the term "Chapter" and the term "Association" shall mean the San Francisco Electrical Contractors Association, Inc. and the term "Union" shall mean Local Union 6, I.B.E.W.

The term "Employer" shall mean an individual firm who has been recognized by an assent to this Agreement.

The conditions herein shall be binding on the "Union," the "Chapter," the "Association," the "Employer" or their lessees, successors, or assigns for the full term hereof.

Each firm signatory to this Agreement shall advise Local Union 6 of the individual in their respective firms who shall be known as the "Employer." Each firm agrees to promptly notify the Union in writing of any change in individual known as the "Employer." It is not the intent of this Agreement to recognize the RME or RMO as an employee for the purposes of this Agreement.

Words used in this Agreement in the masculine gender shall include the feminine.

## BASIC PRINCIPLES

The Association and/or the Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Association and/or Employer, the Union and the Public. Progress in Industry demands a mutuality of confidence between the Association and/or Employer and the Union. All will benefit by continuous peace and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## SCOPE OF AGREEMENT

Electrical work as covered by this Agreement shall include the handling, installing, or moving of all related materials and equipment from the first point of delivery at the jobsite through the final installation, and the dismantling and removing of electrical material from the jobsite, including all work historically performed by employees covered by this Agreement. This shall also include activation of cell systems including the core drilling, welding, burning, brazing, bending, drilling and shaping of all metal brackets, supports, fittings and other fabrication that are specific parts of the installation of the electrical work and equipment on the jobsite.

Also covered under the terms of this Agreement shall be the installation, maintenance, relocation and removal of all temporary wiring and equipment at a jobsite for signal, light, heat or power, and running tests or performance tests on any electrical installation or equipment that is part of any work or jobsite.

## Article I
### EFFECTIVE DATE — CHANGES
### TERMS OF THE AGREEMENT
### TERMINATION — DISPUTES

Section 1. This Agreement shall take effect June 1, 2005, and shall remain in effect through May 31, 2009, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from June 1, through May 31, of each year, unless changed or terminated in the way later provided herein.

(a) The Agreement shall be reopened, with the exception of the termination provision in Article I, which shall not be reopened, if it is determined that within sixty (60) days of any wage and/or price controls that the controls will deprive the Union members from receiving wages or fringe benefit provisions provided in this Agreement. In such re-openings the parties shall negotiate any matter not prohibited by law. Negotiations shall only be on non-cost provisions of this Agreement, and insofar as the same shall not be an effort to evade the law. Any change to the Agreement can only be implemented if it meets the requirements of the wage and/or price controls then enacted. Any disputes regarding this section or regarding the definition of non-cost items shall be referred to an arbitrator as defined in Article I.

2

Sec. 2. (a) Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least one hundred twenty (120) days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice.

(c) The existing provisions of the Agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party has given a timely notice of proposed changes and an agreement has not been reached by the anniversary date to renew, modify or extend this Agreement or to submit the unresolved issues to arbitration, either party may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the parties may jointly submit the unresolved issues to arbitration for adjudication. The arbitrator's decision shall be final and binding on all parties hereto. The arbitrator shall be selected by lot from the list of arbitrators set forth in Section 8.

Sec. 3. This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, and the same as this Agreement.

## GRIEVANCE — DISPUTES

Sec. 4. During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

However, no part of this Agreement is to be interpreted as requiring members of the Union to work behind a recognized picket line or where strike, lockout or other conditions detrimental to the interest of the Local Union prevail.

Sec. 5. There shall be a joint Labor-Management Committee of four (4) who shall be chosen by the Local Union, and four (4) who shall be chosen by the San Francisco Electrical Contractors Association, Inc. It shall meet regularly at such times as it may decide. It shall also meet within forty-eight (48) hours, Saturdays, Sundays and Holidays excluded, after notice is given by either party. It shall select its own Chairman and Secretary.

3

Sec. 6. Problems or disputes between the Union and the Association and/or Employer shall be referred to the Union representative and the contractor's representative within eighteen (18) calendar days from the date of occurrence. If they are unable to resolve the matter, it shall be referred to the Labor-Management Committee.

Sec. 7. All matters coming before the Committee shall be decided by a majority vote. Two (2) members from each of the parties hereto shall constitute a quorum, but each party shall have the right to cast the full vote of its membership, and it shall be counted as though all were present and voting.

Sec. 8. Should this Committee fail to agree or to adjust any matter, such shall then be referred to an arbitrator selected by lot from a list of seven (7) names, obtained from the Federal Mediation and Conciliation Service.

If the selected arbitrator is unable or unwilling to serve, the parties shall have the option of choosing another arbitrator from this list.

If the parties are unable to agree on selecting an arbitrator from this list the parties shall select from a second (2nd) list of seven (7) names provided by the Federal Mediation and Conciliation Service.

His decision shall be final and binding. This arbitrator so selected shall not have the authority to consider any matters other than those specifically presented to him by the Labor-Management Committee.

(a) An arbitrator, when selected as provided in Section 8 shall be required by the parties to agree to schedule the arbitration allowing the parties sufficient time to prepare their cases, but not later than ninety (90) days from the date he accepts the arbitration. The arbitrator as a condition of acceptance of an arbitration case shall agree to render a decision in writing within thirty (30) days following the last day of hearings or from the due date of submittal of briefs.

(b) The fee for the Arbitrator as well as other expenses connected with the formal hearing shall be borne equally by both parties.

(c) The time limits set forth above may be extended by mutual consent by both parties.

Sec. 9. When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matter arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

Sec. 10. If any section of this Agreement is determined to be unlawful and such section requires payment of money by the Employer, any monies that would have been paid had the section been determined to be lawful shall continue to be paid in escrow and the parties shall meet, establish a

joint escrow agreement, and endeavor to provide a lawful substitute utilizing such monies. Alternatively they shall negotiate a lawful provision that shall require approximately the same payment by the Employer. This payment may be allocated to any lawful wage or fringe benefit provision mutually agreeable. If the parties are unable to agree, the matter may be submitted to arbitration as provided in this Agreement.

## Article II
## ASSOCIATION/EMPLOYER'S RIGHTS
## UNION RIGHTS

Section 1. The Employer agrees not to work on new construction, alteration work, and/or any jobs where building trades mechanics are employed on any work covered by this Agreement or amendments thereto, and that all electrical work installed by the Employer shall be confined to minor repairs and trouble shooting that does not exceed two hours to complete, except as provided in Section (a). Working in excess of this time shall be a violation of this Agreement.

(a) The Employer may work with the tools on 1 and 2 family wood frame residential construction only, providing:

1. He employs no more than three (3) workmen including himself under the terms of this Agreement.

2. He employs at least one Journeyman in addition to himself.

3. He works with a Journeyman, when he works with the tools.

4. He lives up to the terms and conditions of this Agreement.

There is a prescribed penalty for violations of this section which shall not be less than an amount equal to the wages and fringes equivalent to the time he worked with the tools under other conditions and such shall be payable to the Northern California Electrical Workers Pension Trust Fund.

Sec. 2. Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation having these qualifications and maintaining a permanent place of business and a suitable financial status to meet payroll requirements. Such Employer must be in possession of a valid state license as an Electrical Contractor and be registered with the Electrical Inspection Division of the Department of Building Inspection doing work in accordance with applicable codes and employing at least one Journeyman regularly.

(a) Each Employer shall maintain on deposit with the custodian of the various fringe benefit programs (E.I.S.B., Inc.) an Assignment of Cash-on-Deposit or a performance bond in an amount listed below as surety of the prompt and full payment of fringe benefit contributions. Individual Employers who fail to remit as provided herein, shall upon seventy-two (72) hours notice (except Sundays and Holidays) by certified mail given by the Union, be subject to having their employees removed until such time as compliance is effected. Bond forms and Assignment of Cash-on-Deposit forms shall be in language agreed to by the parties to this Agreement.

## Bonding Schedule

| | |
|---|---|
| (1) One (1) to ten (10) Employees | $10,000.00 |
| (2) One (1) to fifty (50) Employees | $50,000.00 |
| (3) One (1) to one hundred (100) employees | $100,000.00 |

(4) Over one hundred (100) employees add the appropriate increments above.

(b) When the employers' fringe benefit bond is renewed it shall be renewed at the manpower level at that time.

Sec. 3. No Employer shall, directly or indirectly or by any subterfuge, sublet or contract with workmen or any person, firm, or corporation not under this Agreement, or enter into agreement with any other union for all or part of the labor services to be performed which fall within the International Brotherhood of Electrical Workers (Inside Wiremen) trade jurisdiction.

Sec. 4. The Employer agrees that he shall not dismiss or otherwise discriminate against any employee for making a complaint or giving evidence to the representative of the Union with respect to an alleged violation of any provisions of this Agreement.

Sec. 5. The Employer shall not interchange or cause to be loaned any workman under the terms of this Agreement to another Employer. Any Employer signatory to this Agreement who enters into a joint venture, or sub contract for the purpose of this Section, shall be considered as a separate Employer.

Sec. 6. For all employees covered by this Agreement, the Employer shall carry Workmen's Compensation Insurance through a reputable Company or State Fund; comply with the Federal Social Security Act, California Unemployment Insurance Act, and be a licensed electrical contractor in the State of California and be registered with the Electrical Inspection Division of the Department of Building Inspection in the City and County of San Francisco.

Sec. 7. Upon the request of the Business Manager of the Union or the Secretary of the Labor-Management Committee, in writing, each individual Employer shall furnish, within three (3) business days after written request, the number, the complete payroll and/or employee job records, on a job or a shop basis, for all employees employed under this Agreement.

Sec. 8. The Business Manager or his representative of the Union shall be allowed access to any shop or job where workmen are employed under this Agreement. Where necessary the Employer shall attempt to make arrangements for access.

Sec. 9. The Employer agrees to identify all vehicles used primarily to transport material, tools, workmen, or equipment for work, covered by this Agreement. The firm name and location must be affixed on both sides of each vehicle in a permanent manner, with two inch (2") legible letters accepted as minimum. Removable signs will not comply with this Section. Workmen shall not drive unidentified Employer vehicles.

Sec. 10. The Local Union is a part of the International Brotherhood of Electrical Workers, and any violation or annulment by an individual Employer of the approved agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting, or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

All charges of violations of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provision of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Sec. 11. The policy of the Union and the workmen it represents is to promote the use of materials and equipment manufactured, processed, or repaired under economically sound wages, hourly and working conditions by their fellow members of the International Brotherhood of Electrical Workers.

No workman shall be discriminated against for his individual decision not to work on any materials or equipment which he believes are not so manufactured or processed, or to work on any job he believes is not in the best interests of himself or the International Brotherhood of Electrical Workers or the Electrical Construction Industry.

Sec. 12. No Employer shall assign workmen under this Agreement to any electrical work or project taken over from a previous Employer who is in default as to wages or fringe benefit payments on such work or project until such default has been corrected or guaranteed by cash deposit or special bond with the E.I.S.B., Inc.

Sec. 13. The Association and/or Employer agrees that it shall not constitute a violation of this Agreement for the Union to remove the workmen employed by an Employer who is delinquent in any wage or fringe payment due under the terms of this Agreement.

Sec. 14. "Dual Capacity": All manual electrical work shall be performed by workmen employed under the terms of the Agreement and the applicable supplements thereto, (except as provided in Article II, Section 1). No workman shall himself become a contractor for the performance of any electrical work while he is subject to employment or remains subject to employment under the terms of this Agreement and/or supplements thereto.

Employees or applicants for employment holding a license as an electrical contractor in the State of California shall inactivate their license in accordance with Division III, Chap. 9, Section 7076.5 of the Business and Professions Code before being accorded the use of referral facilities available under this Agreement.

(a) It shall be a violation of this Agreement for any workman to contract for any electrical work, unless the workman becomes signatory to a Letter of Assent and is bound by all terms and conditions contained in this Agreement.

Sec. 15. The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

Sec. 16. In order to be competitive in the market and to meet the special needs of Employers on particular jobs, the Union may provide special consideration to Employers who request such treatment and who demonstrate, to the Union's satisfaction, a specific marketing need with regard to a particular job. Any special terms, conditions, modifications or

8

amendments so provided by the Union, shall be implemented with regard to the particular job for which they were requested. To the extent feasible within time constraints, such special terms, conditions, modifications or amendments shall be made available to all signatory Employers with regard to the particular job in question, but shall not constitute an action subject to the favored nations clause in this Agreement.

Sec. 17. The Employer shall not enter into an agreement, with any other union, covering any work, which is covered by this Agreement.

This section is not intended to settle jurisdictional disputes.

Sec. 18. The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

Sec. 19. In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners or stockholders, exercises either directly or indirectly, management control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

Sec. 20. Any Employer, applicant, or workman attempting to circumvent or bypass the provisions of this referral procedure either in the solicitation of work or offering of employment to workmen shall be in violation of this Agreement.

Sec. 21. The Employer agrees that, if it has not previously done so, it will recognize the Union as the exclusive collective bargaining agent for all employees performing electrical work within the jurisdiction of the Union, on all present and future job sites; if and when a majority of the Employer's employees authorized the Union to represent them in collective bargaining.

Sec. 22. The Employer may recall a former employee, who has worked at least one year with the Employer, and who is continuously since layoff, on the Group I out-of-work list, not exceeding 6 months; providing the employee has accepted no other work in the jurisdiction of Local Union 6. An employee must have worked one year with the employer following his recall prior to being eligible for a second recall by the same employer.

Sec. 23. An Employer may call an employee to work as Foreman by name provided:

(a) The employee has not quit his most recent previous employer.

(b) The Employer shall notify the Business Manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the Business Manager shall refer said Foreman provided the name appears on GROUP I.

(c) The person hired must be employed for a minimum of 1,000 hours as a working foreman or receive a lay off.

1. After 1,000 hours have been worked the employer may change the individual's foreman status to either General Foreman or Journeyman depending on job requirements.

Sec. 24. The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles, and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

(a) The parties agree to meet to negotiate terms and conditions prior to implementation of the IBEW NECA Category 1 Substance Abuse Policy.

## Article III
## REFERRAL PROCEDURE — UNION SECURITY

Sec. 1 (a)    In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interest of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment:

(b) The Union shall be the sole and exclusive source of referral of applicants for employment.

(c) The Employer shall have the right to reject any applicant for employment.

(d) The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, by-laws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

(e) The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

GROUP I. All applicants for employment who have four (4) or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

GROUP II. All applicants for employment who have four (4) or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of

1 the I.B.E.W. or have been certified as a Journeyman Wireman by any Inside
2 Joint Apprenticeship and Training Committee.
3
4 GROUP III. All applicants for employment who have two or more years'
5 experience in the trade, are residents of the geographical area constituting
6 the normal construction labor market <u>and</u> who have been employed for at
7 least six (6) months in the last three (3) years in the geographical area
8 covered by the collective bargaining agreement.
9
10 GROUP IV. All applicants for employment who have worked at the trade
11 for more than one (1) year.
12     (f) If the registration list is exhausted and the Union is unable to refer
13 applicants for employment to the Employer within 48 hours from the time of
14 receiving the Employer's request, Saturdays, Sundays and Holidays
15 excepted, the Employer shall be free to secure applicants without using the
16 Referral Procedure, but such applicants, if hired, shall have the status of
17 "temporary employees."
18     (g) The Employer shall notify the Business Manager promptly of the
19 names and Social Security numbers of such "temporary employees" and
20 shall replace such "temporary employees" as soon as registered applicants
21 for employment are available under the Referral Procedure.
22     (h) "Normal construction labor market" is defined to mean the
23 following geographical area plus the commuting distance adjacent thereto
24 which includes the area from which the normal labor supply is secured:
25     CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA. The
26 above geographical area is agreed upon by the parties to include the areas
27 defined by the Secretary of Labor to be the appropriate prevailing wage area
28 under the Davis-Bacon Act to which this Agreement applies.
29     (i) "Resident" means a person who has maintained his permanent
30 home in the above defined geographical area for a period of not less than
31 one (1) year or who, having had a permanent home in this area, has
32 temporarily left with the intention of returning to this area as his permanent
33 home.
34     (j) An "examination" shall include experience rating tests if such
35 examination shall have been given prior to the date of this procedure, but
36 from and after the date of this procedure shall include only written and/or
37 practical examinations given by a duly constituted Construction Local Union
38 of the I.B.E.W. Reasonable intervals of time for examinations are specified
39 as ninety (90) days. An applicant shall be eligible for examination if he has
40 four years' experience in the trade.

(k) The Union shall maintain an "Out-of-Work-List" which shall list the applicants within each group in chronological order of the dates they register their availability for employment.

(l) An applicant who is hired and who receives, through no fault of his own, work of 35 hours or less shall, upon re-registration, be restored to his appropriate place within the Group. This may be extended to ten (10) consecutive calendar days at the discretion of the Business Manager.

(m) Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I in the order of their places on the Out-of-Work-List and then referring applicants in the same manner successively from the Out-of-Work-List in GROUP II, then GROUP III and then GROUP IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within his GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within the GROUP.

(n) An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral. The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges. The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks or longer depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

(o) The only exceptions which shall be allowed in this order of referral are as follows:

(1) When the Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing the skills and abilities.

(2) The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

1    (p) An Appeals Committee is hereby established composed of one
2    member appointed by the Union, one member appointed by the Association,
3    as the case may be, and a Public Member appointed by both of these
4    members.

5    (q) It shall be the function of the Appeals Committee to consider any
6    complaint of any employee or applicant for employment arising out of the
7    administration by the Local Union of Section 1 (d) through Section 1 (o) of
8    the Agreement. The Appeals Committee shall have the power to make a
9    final and binding decision on any such complaint which shall be complied
10   with by the Local Union. The Appeals Committee is authorized to issue
11   procedural rules for the conduct of its business, but it is not authorized to
12   add to, subtract from, or modify any of the provisions of this Agreement,
13   and its decision shall be in accord with this Agreement.

14   (r) A representative of the Employer or of the Association, as the case
15   may be, designated to the Union in writing, shall be permitted to inspect the
16   Referral Procedure records at any time during normal business hours.

17   (s) A copy of the referral procedure set forth in this Agreement shall
18   be posted on the Bulletin Board in the offices of the Local Union and in the
19   offices of the Employers who are parties to this Agreement.

20   (t) Apprentices shall be hired and transferred in accordance with the
21   apprenticeship provisions of the Agreement between parties.
22

23   Sec. 2. Any individual employee claiming a grievance by any act or conduct
24   in effecting referrals and who contends the referral procedure is not
25   operating in accordance with the terms of this Agreement shall have the
26   right to file a specific written complaint with the Appeals Committee within
27   forty-eight (48) hours (Saturdays, Sundays and Holidays excluded) after the
28   occurrence of the event constituting the purported grievance. Failure to file a
29   grievance in writing within the time limit above specified shall constitute a
30   waiver and abandonment of such grievance.
31

32   Sec. 3. All employees covered by the terms of this Agreement shall be
33   required to become and remain members of the Union as a condition of
34   employment from and after the eighth day following the date of their
35   employment or the effective date of this Agreement, whichever is later.

## Article IV
## HOURS, WAGE PAYMENT, APPRENTICES,
## WORKING CONDITIONS

Sec. 1. Seven (7) hours shall constitute a day's work: from 8:00 A.M. to 12:00 Noon, and from 12:30 P.M. to 3:30 P.M. five (5) days from Monday to Friday inclusive shall constitute the workweek. All work performed before or after the times specified above and on Saturdays, Sundays and the following Holidays shall be paid for at the rate of double time.

A total of two (2) hours may be worked during the hours of 6:00 A.M. to 8:00 A.M.; or 3:30 P.M. to 5:30 P.M.; or 7:00 A.M. to 8:00 A.M. and 3:30 P.M. to 4:30 P.M.; Monday through Friday, excluding Holidays, at time and one-half and all hours worked during the day must be continuous for the time and one-half rate to apply, but it shall not be mandatory to work those hours.

An employee may work seven (7) hours on Saturday between 8:00 A.M. and 3:30 P.M. at time and one-half providing the employee has not worked any overtime during that week.

New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day (4th of July), Friday preceding Labor Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, the day before Christmas when it falls on Monday through Friday, and Christmas.

When any of the above Holidays fall on Sunday, the following day shall be observed in lieu thereof. No overtime shall be performed without permission of the Business Manager.

New Year's Day, Independence Day (4th of July), Thanksgiving Day, the day after Thanksgiving, the day before Christmas when it falls on Monday through Friday, and Christmas Day, shall be observed on their designated historical day. The other holidays shall be observed as follows:

Martin Luther King Jr. Day – Third Monday in January
President's Day - Third Monday in February
Memorial Day - Last Monday in May
Friday preceding Labor Day
Labor Day - First Monday in September

Sec. 2. Employees required to work four (4) hours or more before the beginning of regular working hours, shall be paid at the double time rate for hours worked until relieved from duty. Employees required to work less than four (4) hours before their regular starting time shall be paid at the overtime rate until starting time of their regular workday, and straight time for their regular workday. Meal periods shall not constitute relieved from duty for the application of this provision.

(a) A meal period of thirty (30) minutes shall be allowed on the Employer's time at the end of the regular workday or before the regular workday, if employees are required to work overtime in excess of two (2) hours.

(b) Employees required to work overtime past the quitting time of their regular work day, must be relieved from work for a period of at least eight (8) hours before resuming work. The start time of the following regular work day may be scheduled to begin after a relief period of at least eight (8) hours, or employees shall be paid at the double time rate upon resuming work that day.

(c) When men are required to report to a shop, offices, supply houses, tool sheds, or field headquarters, they shall not leave same earlier than 8:00 A.M. and return not later than 3:30 P.M. unless overtime rates are paid.

Sec. 3. Any workman required to report for work shall receive not less than four (4) hours pay for that calendar day. Emergency calls - minimum of (1) hour at double time rate. Time to start when called.

Workmen who are scheduled to report for work and who cannot do so shall, if possible, notify the Employer prior to 8:30 A.M.

Sec. 4. When it is necessary to work overtime on any job covered by this Agreement, men working on the job shall be given first preference. Men from other jobs shall not be brought in to work on overtime until all men on the job have been offered the opportunity to work.

Overtime shall be divided equally, insofar as practical, among the men working on the job where the overtime is required, except for job supervision and/or special skills or job knowledge.

(a) A meal period of thirty (30) minutes shall be allowed on the Employer's time at the end of the regular workday or before the regular workday, if employees are required to work overtime in excess of two (2) hours.

(b) Employees working overtime shall receive a lunch period of thirty (30) minutes on Employer's time every four (4) hours, i.e. Monday thru Friday 3:30/4:00 p.m. first paid meal period, 7:30/8:00 p.m. next paid meal period.

(c) The foregoing shall not apply to the first meal period on Saturdays, Sundays and Holidays.

(d) Employees required to work during any regular lunch period shall receive the established overtime rate for such lunch period and shall thereafter be allowed a reasonable opportunity to eat his lunch for thirty minutes (30), on the Employer's time.

Sec. 5. Whenever 20% of the Inside Wiremen dispatched from the Group I or Group II out of work list, or currently employed by electrical contractors with 1,760 or more hours for the year become unemployed for a period of two (2) weeks, the work week shall be reduced from five (5) days to four (4) days.

The number of Inside Wiremen to be used as 100%, against which 20% is determined, shall be concluded as follows:

Based on reports furnished by the E.I.S.B., an "average number" of Group I Inside Wiremen working for electrical contractors in San Francisco for one calendar year, January through December, shall be agreed to by a committee composed of two (2) representatives from labor and two (2) representatives from management. Once this "average number" is agreed to, it will become the number used to represent 100% effective June 1st, renewable annually.

Sec. 6. Each shop that employs two (2) or more Journeymen must designate one (1) as the full-time Foreman. Any job on which three (3) or more Journeymen are employed shall require a Job Foreman. No Foreman shall supervise more than ten (10) men.

No workman shall be allowed to act as Foreman on more than one job at a time.

Each shop that employs three (3) or more Cable Splicers must designate one (1) as a full time working Cable Splicer Foreman. No Cable Splicer Foreman shall supervise more than ten (10) Cable Splicers. The selection of the Journeyman who shall be the Foreman or General Foreman shall be at the discretion of the Employer. Cable Splicers Helpers shall be Journeymen.

(a) General Foremen are Journeymen who give instructions to Foremen, Job Foremen, and Journeymen on jobs that do not require a Foreman. On jobs having a General Foreman, Foremen are not to take directions or orders or accept layout of any work from anyone except the General Foreman. This does not deny the Employer or his representative the right to give directions, orders, or layout of work through the proper channels. A General Foreman shall not supervise more than eight (8) Foremen on any job or project, and a General Foreman, where one is required, shall not work with the tools or material except in cases of emergency.

(b) Foremen are Journeymen who give instructions to Journeymen on jobs that do not require a Foreman. On jobs having a Foreman, workmen are not to take directions or orders or accept the layout from anyone except the Foreman. This does not deny the Employer or his representative the right to give directions, orders or layout of work through the proper channels.

(c) The wage schedule listed below shall be the minimum wage rates which includes 4% Vacation Pay, 4% Thrift Savings and 4% shall be the Value of the Listed Holidays, effective on the dates indicated:

|  | Effective June 1, 2005 per hour |
|---|---|
| Journeyman Foreman, Shop Foreman, and Cable Splicer | $46.55 $52.37 |
| General Foreman | $58.19 |

Note: See Article VI, Section 7(b) and Article VII, for M.P.P. option.

## Apprentices (per hour)

| WAGE RATES | | | | PENSION CONTRIBUTIONS | | |
|---|---|---|---|---|---|---|
| 1st 12 months | 40% | .................. | $18.62 | 40% | ........................ | $0.00 |
| 3rd 6 months | 45% | .................. | $20.95 | 45% | ........................ | $2.90 |
| 4th 6 months | 50% | .................. | $23.28 | 50% | ........................ | $3.23 |
| 5th 6 months | 55% | .................. | $25.60 | 55% | ........................ | $3.55 |
| 6th 6 months | 60% | .................. | $27.93 | 60% | ........................ | $3.87 |
| 7th 6 months | 65% | .................. | $30.26 | 65% | ........................ | $4.19 |
| 8th 6 months | 70% | .................. | $32.59 | 70% | ........................ | $4.52 |
| 9th 6 months | 75% | .................. | $34.91 | 75% | ........................ | $4.84 |
| 10th 6 months | 80% | .................. | $37.24 | 80% | ........................ | $5.16 |

Journeyman increase effective June 1, 2006, $2.30 per hour and June 1, 2007, $2.95 per hour and June 1, 2008, $3.15 per hour (this increase is based on the Journeyman classification. All other classifications to be increased on their historical percentage).

Various fringe benefit payments may be increased prior to June 1 of any year by reducing the above rates accordingly.

Sec. 7. Men laid off shall be notified of such layoff at least one (1) hour before termination of work. Men shall be paid all wages due immediately when laid off, and such wages shall include the one (1) hour's pay after notification.

(a) When workmen are laid off, the Employer shall complete a termination report form as supplied and must comply with the instructions on said form.

Sec. 8. Wages shall be paid every Wednesday by the Electrical Employer by whom the workman is employed, and not more than three (3) days' wages shall be withheld. The Employer shall pay wages on the job or allow employees sufficient time to reach the shop on payday before the close of working hours. Any workman laid off or discharged by the Employer shall be paid all his wages immediately. In the event he is not paid off, waiting time at the straight time rate of pay shall be paid until payment is made. The time calculated is on a 24 hour basis. Wages shall be paid on Tuesday when a recognized holiday falls on Wednesday and the Tuesday payday shall be the same as the normal Wednesday payday.

Payroll checks which are issued to employees and are not cashed because of insufficient funds, account closed or similar problems and provided the attempt to cash the check is done within two (2) weeks of receiving the check, the check shall be subject to waiting time until the check is cashable unless the Labor-Management Committee determines that the circumstances involved were beyond the control of the Employer such as a legitimate administrative error within the Employer's office.

(a) Employers whose principal place of business is located outside the State of California and who do not have a bona fide Branch office located in the State of California shall use payroll checks drawn on an account located at a San Francisco Bank.

Sec. 9. Wages shall be paid for all time in going from the shop to the job, from the job to the shop and from the job to job. Carrying tools or material to or from the job is considered as working and no workman shall carry tools or material outside of working hours. The Employer shall provide transportation for all tools and materials.

Sec. 10. No workman shall use his automobile or other conveyance in any manner detrimental to the best interest of the other workmen. Workmen shall not be allowed to use their own automobiles or other conveyance for the transportation of themselves, Employer's tools or material at any time. The workman may use his own automobile or other conveyance to and from the job before and after working hours in this jurisdiction.

Sec. 11. No workman shall drive Employer's automobile or other conveyance before or after regular working hours. Workmen keeping Employer's automobile or conveyance at their residence or garage shall not drive same more than one (1) hour before or one (1) hour after the regular workday.

Sec. 12. Employers' vehicles used in the on-jobsite performance of work under this Agreement, shall be operated by workmen covered by this Agreement.

Sec. 13. Every fifth man in any shop shall be fifty-five (55) years of age, or older, when such men are available.

Sec. 14. When Employers send workmen to perform work outside the jurisdiction of the Union where a different wage rate prevails, they shall be paid the highest rate. When workmen are required to work in any jurisdiction that does not participate in the same employee plans as set forth in Article VI of this Agreement, the Employer shall comply with the requirements of Article VI.

Sec. 15. The Employer shall furnish transportation during regular working hours to and from all jobs within the jurisdiction of the Union. On all work outside the jurisdiction of the Union, the Employer shall furnish transportation, board, room, and all other necessary expenses, including time traveling outside of regular working hours. Reasonable expense shall be allowed for overnight trips, with fifteen dollars ($15.00) per day per man for a seven (7) day week recognized as a minimum amount.

Workmen who are required to work overtime on jobs outside of this jurisdiction and who are not required to remain away overnight shall continue on the overtime rate (double time) while returning to the shop.

For the purpose of this Section, 55 Fillmore Street shall be considered as the shop location for the employers who do not maintain a shop in the City and County of San Francisco.

Travel time outside of the workday shall be at the rate of pay for that day as defined by Article 4, Section 1 of this agreement.

Sec. 16. An employer signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four bargaining unit employees employed in that Local Union's jurisdiction into this Local's jurisdiction and up to two bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Sec. 17. No workman shall furnish stocks, dies, stilson wrenches over fourteen (14) inches long, hack saw blades, fish steel, wood bits, hickeys, rotary cutters, taps, twist drills, acetylene torch, presto tank, portable electric drills, ladders, vises, gads, star drills, special tools of any kind or special tool boxes.

Sec. 18. The Employer shall only be responsible for the replacement of the employee's tools lost or damaged due to fire or theft under the following terms and conditions while those tools are located within the jurisdiction of Local Union 6, except when an employee's tools are lost outside the jurisdiction of Local Union 6 when he is sent by the Employer to such location.

(a) The liability of the Employer shall be limited to the tools listed in the approved inventory form, less the first ten dollars ($10.00). This amount will be the responsibility of the employee.

(b) Each employee shall submit to the Employer or his representative a tool inventory list approved by the Labor-Management Committee and furnished by the Union.

(c) It shall be the responsibility of the Employer or his representative to verify the inventory list; failure to do so shall be an admission of liability for the listed tools in case of fire or theft.

(d) When the Employer does not provide a safe locked building, room, tool shed or vehicle for the storage of the employees' tools or when the tools are in the custody of the Employer or his representatives, the Employer shall be liable for the complete replacement of listed tools.

(e) It shall be the responsibility of the employee to use all reasonable means to preserve and protect his tools. Failure to do so will relieve the Employer of all liability. Any employee willfully making false or inaccurate claims will be in violation of this Agreement and will be dealt with by the Union.

(f) In the event of a disputed claim, both the Employer or his representative and the employee must appear before the Labor-Management Committee, whose ruling shall be binding. If the Employer requires the employee to appear before the Committee, the Employer shall pay for all hours involved.



(g)    Journeyman-wiremen shall provide themselves with the following tools:

Tool Box - 20" x 8 1/2" x 9 1/2" minimum
2 Pliers, Channel Lock
Pliers, Diagonal Cutters 8"
Pliers, Side Cutters - 9" Offset with Insulated Handles
Pliers, Long Nose 8"
Wrench, Adjustable Crescent 6"
Wrench, Adjustable Crescent 10"
Wrench, Pipe - 10"
Wrench, Pipe - 14" or small Chain Tong
Hammer, Straight Claw
Screwdriver - 2 1/2" Blade, 5" Blade, 8" Blade
Wrench, Set Screw, set of eleven Allen
Chisel, Wood 1/4" Cold - 1/2"
Screwdriver, Offset 1/4"
Saw, Hack, Frame and adjustable
Saw, 3 Blade, Keyhole, Metal, Wood
Rule, 6' Wood
Punch, Center
Awl
Plumb bob-8 oz.
Square, Combination - 12"
Knife, Wire Skinning, Pocket
Level, 9" Torpedo, Magnetic
Tester, Knopp with pouch or equal
Tap Wrench, up to 1/4 - 20
Steel Tape 50'
Steel Tape 12' minimum, 25' maximum
Chalk Line
Airplane Shears - 10"
Flashlight
2 Phillips Screwdrivers, Size 1 and 2
Spin Tite Wrench Set - 1/4", 5/16", 7/16"
5" Leather Pocket Pouch
Protractor Level
Screwholder insulated
Wirestripper

Sec. 19. All cord drops, molding, and conduit work must be made up and prepared on the job, except on any one job two (2) pieces of conduit may be cut and threaded at the shop by the Journeyman doing said work.

(a) This section shall not apply to prelamped fixtures.

Sec. 20. Journeymen are to correct any work installed in violation of the requirements of the authority having jurisdiction, unless such work was installed as instructed by the Employer or his agent. Report of violations shall be made in writing within seventy-two (72) hours, Saturdays, Sundays and Holidays excluded to the representative of the Association and to the Union. Correction to be made only after a fair investigation, such investigation by the representative of the Association, as defined in the introduction to this Agreement, and the Business Manager of the Union shall be made not later than the first working day following the report to the Business Manager of such improper workmanship and the decision relative to each report of improper workmanship shall be made immediately upon the completion of this investigation and such investigation shall not exceed five (5) working days.

Sec. 21. All employees working on unguarded or swinging scaffolds, boatswain's chairs, working on or climbing unguarded ladders of poles or towers, or unguarded structures in heights in excess of sixty feet (60'), shall be paid time and one-half the regular rate of pay, and when working in heights in excess of ninety feet (90') shall be paid double the hourly rate of pay. The applicable rate shall be paid for a minimum of two (2) hours.

(a) When employees are required to work in any hazardous area they shall be supplied with protective clothing and equipment by the Employer. Any safety equipment or necessary protective devices shall be supplied to workmen by the Employer.

Sec. 22. On all energized circuits of four hundred and forty (440) volts or over, as a safety measure, two (2) or more Journeymen of the proper classification must work together, except for testing or replacing fuses.

These provisions shall also apply to working on energized two hundred and seventy-seven (277) volt circuits.

Sec. 23. Underground and Tunnel Work. All rates of pay shall be increased when work is performed in any uncompleted tunnel or shaft. All rates of pay for men assigned to work in such tunnels or shafts shall be increased ten percent (10%). Employees on the job for five (5) hours during the regular working hours shall receive a minimum of a day's pay. The Employer shall furnish and be responsible for all safety equipment and clothing as required by the Division of Industrial Safety or as required by special conditions.

Sec. 24. When employees are required to work in any area that is under full asbestos containment procedures and required to wear related safety clothing and breathing apparatus said employees shall receive the regular hourly rate plus 10%.

When employees are required to work less than seven continuous hours they shall receive the regular rate plus 10% per hour worked, provided however no employee shall receive less than two (2) hours at the regular hourly rate plus 10%.

Asbestos certification shall be recognized as a special skill. Employees shall not be responsible for any costs associated with certification or any required equipment for performing work under asbestos containment.

Employees cannot be terminated for refusal to work in an asbestos area.

Sec. 25. When workmen are transported by non scheduled aircraft they shall be protected by a Life and Casualty Insurance Policy in the amount of $50,000.00, in addition to regular Workmen's Compensation coverage.

Sec. 26. If during the terms of this agreement, the Davis-Bacon prevailing wage rate is lowered as the result of a wage survey causing the lowering of such prevailing wage rate, subject to the requirements set forth below, all signatory contractors shall be permitted to bid future federal public works projects, not already awarded or bid, at the lower prevailing wage rate. If, during the term of this agreement, the state prevailing wage rate is lowered as the result of a wage survey causing the lowering of such prevailing wage rate, subject to the requirements set forth below, all signatory contractors shall be permitted to bid future state public works projects, not already awarded or bid at the lower prevailing wage rate. Before any contractor is permitted to pay less than the contractual wage rate as the result of a wage survey lowering the prevailing wage rate as described above, the contractor must: receive written verification from the parties to this agreement that the lower advertised wage rate is the applicable wage rate to be used in the bid for that project.

# SHIFT WORK

Sec. 27. When so elected by the contractor, multiple shifts of at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

    (a) The first shift (day shift) shall be worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the day shift shall receive eight (8) hours' pay at the regular hourly rate for eight (8) hours' work.

    (b) The second shift (swing shift) shall be worked between the hours of 4:30 P.M. and 12:30 A.M. Workmen on the "swing shift" shall receive eight (8) hours' pay at the regular hourly rate plus 10% for seven and one-half hours (7 1/2) hours' work.

    (c) The third shift (graveyard shift) shall be worked between the hours of 12:30 A.M. and 8:00 A.M. Workmen on the "graveyard shift" shall receive eight (8) hours' pay at the regular hourly rate plus 15% for seven (7) hours' work.

    (d) A lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required after the completion of a regular shift shall be paid at one and one-half (1-1/2) times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight-time rate shall be the maximum compensation for any hour worked.

There shall be no requirement for a day shift when either the second or third shift is worked.

Sec. 28. Employees transferred from one shift to another, unless relieved from work at least a full shift as set forth herein, before starting their new shift, shall be paid the overtime rates for the first such shift worked. However, if an employee working on the "first" or regular daylight shift is required to return to work on the "third" shift within the same twenty-four (24) hour workday period, he shall receive double time for the first such "third" shift worked. The twenty-four (24) hour period mentioned herein shall be the twenty-four (24) hour period commencing with the starting time of the day shift. No employee shall be transferred from his regular assigned shift to another shift more than once in a workweek. Except, however, he may be returned to his regular assigned shift.

    (a) Shift starting time may be changed up to two (2) hours. When this is implemented all corresponding conditions shall change accordingly.

# APPRENTICES

Sec 29. (a) There shall be a minimum of 10 periods of apprenticeship. The first two periods, consisting of 800 hours each and satisfactory progress of the related classroom training shall constitute the probationary period. Successive periods will require the minimum hours OJT and satisfactory progress of related classroom training. The 10 (ten) periods are as follows:

| Ten Periods | OJT Hours | Related Training |
|---|---|---|
| 1 | 0-800 | Satisfactory progress |
| 2 | 801-1600 | 1st Year school with satisfactory progress |
| 3 | 1601-2400 | 2nd Year 1st Semester with satisfactory progress |
| 4 | 2401-3200 | 2nd Year School with satisfactory progress |
| 5 | 3201-4000 | 3rd Year 1st Semester with satisfactory progress |
| 6 | 4001-4800 | 3rd Year School with satisfactory progress |
| 7 | 4801-5600 | 4th Year 1st Semester with satisfactory progress |
| 8 | 5601-6400 | 4th Year School with satisfactory progress |
| 9 | 6401-7200 | 5th Year 1st Semester with satisfactory progress |
| 10 | 7201-8000 | 5th Year School with satisfactory progress |

(b) For the purpose of "employer's designated supervisor", listed in Article V, Section 5.13, said supervisor shall be a General Foreman or Foreman. General Foreman or Foreman may assign tasks to first year apprentices only.

(c) First year apprentices shall not work on or near live voltage circuits or systems.

# Article V
## APPRENTICESHIP

Sec. 5.01. There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of either 6 or 8 members who shall also serve as trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (unindentured, intermediate journeymen, etc.).

Sec. 5.02. All JATC member appointments, reappointments and acceptance of appointments shall be in writing. Each member shall be appointed for a 3 year term unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for Trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Sec. 5.03. Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article One of this agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

Sec. 5.04. There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Sec. 5.05. The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Sec. 5.06. To help ensure diversity of training, provide reasonable continuous employment opportunities and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Sec. 5.07. All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.



Sec. 5.08. The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the job site ratio as per Section 5.12.

Sec. 5.09. Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Sec. 5.10. To accommodate short-term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet the basic qualifications for apprenticeship. Unindentured workers shall not remain employed if apprentices become available for OJT assignment. Unindentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer—agreeing that they are not to accumulate more than two thousand (2,000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, Introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

Sec. 5.11. The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured. Contributions to other benefit plans may be addressed in other sections of this agreement.

Sec. 5.12. Each job site shall be allowed a ratio of two (2) apprentices for every three (3) Journeyman Wiremen or fraction thereof as illustrated below.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| etc. | etc. |

The first person assigned to any job site shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Sec. 5.13. An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Sec. 5.14. Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

31

1    Sec. 5.15. The parties to this Agreement shall be bound by the Local
2    Joint Apprenticeship and Training Trust Fund Agreement which shall
3    conform to Section 302 of the Labor-Management Relations Act of 1947 as
4    amended, ERISA and other applicable regulations.

5    The Trustees authorized under this Trust Agreement are hereby
6    empowered to determine the reasonable value of any facilities, materials or
7    services furnished by either party. All funds shall be handled and disbursed
8    in accordance with the Trust Agreement.

9    Sec. 5.16. All Employers subject to the terms of this Agreement shall
10   contribute the amount of funds specified by the parties signatory to the local
11   apprenticeship and training trust agreement. The current rate of contribution
12   is: ninety-three and one-half cents ($0.935) (percent of the gross monthly
13   payroll.)-(or)-(cents per hour for each hour worked or cents per hour for
14   each hour paid.) Effective June 1, 2006 the contribution rate shall be ninety-
15   eight and one-half cents ($0.985) (percent of the gross monthly payroll.)-
16   (or)-(cents per hour for each hour worked or cents per hour for each hour
17   paid.) This sum shall be due the Trust Fund by the same date as is their
18   payment to the NEBF under the terms of the Restated Employees Benefit
19   Agreement and Trust.

## Article VI
## VACATION, HOLIDAY, THRIFT SAVINGS,
## HEALTH & WELFARE, PENSION,
## N.E.B.F., N.E.I.F., E.I.S.B.

Sec. 1. The Employer agrees to make the contributions required by this Agreement to the Trust Funds created by; and/or to be bound by the terms of the following Trust Agreements and any subsequent amendments thereto;

1. The Northern California Electrical Workers Pension Trust, as amended.
2. The Electrical Workers Health and Welfare Trust for San Francisco.
3. The San Francisco County Electrical Industry Apprenticeship and Training Trust, as amended.
4. The Electrical Industry Service Bureau (E.I.S.B.),
5. The National Employees Benefit Agreement (N.E.B.F.),
6. The National Electrical Industry Fund (N.E.I.F.),

(a) The contributions required in Section 1 shall be sent monthly on a transmittal form supplied by E.I.S.B., Inc. The completed form shall list the following information concerning each employee and shall be set forth in separate SEQUENTIAL columns AS FOLLOWS: (1) Social Security Number; (2) Name of Employee; (3) Class; (4) Number of Hours Worked; (5) Gross Pay; (6) Hourly Wage Rate; (7) Amount of Vacation Allowance, Value of the Listed Holidays, Thrift Savings Deduction, (8) Union Membership Dues and Assessments and (9) Administrative Maintenance Fund. There shall be only one entry per employee. Computer printouts will be acceptable providing the printout is prepared in the exact format described above and is accompanied by a completed recap transmittal form.

Sec. 2. The Employer shall withhold twelve percent (12%) of each employee's gross weekly wage and shall deposit this amount to the individual employee's Vacation, Holiday and Thrift Savings account in the financial institution selected by the Labor-Management Committee as provided below.

Hereinafter, these accounts shall be referred to as Vacation Allowance, Value of the Listed Holidays and Thrift Savings, i.e., four percent (4%) for Vacation Allowance, four percent (4%) for the Value of the Listed Holidays as listed in Article IV, Section 1 and four percent (4%) for the Thrift Savings Deduction.

(a) This Vacation Allowance, the Value of the Listed Holidays and Thrift Savings shall be withheld from the employees weekly pay and shall be sent on a monthly transmittal to: E.I.S.B., Inc., 720 Market Street, Suite 700, San Francisco, California 94102, together with a check payable to: A financial institution selected by the Labor-Management Committee - Electrical Industry Accounts.

(b) The Employer shall make all legal payroll withholdings for income tax, social security, unemployment insurance, etc. from the total wages, including Vacation Allowance, Value of the Listed Holidays and Thrift Savings Deduction, and shall then withhold the full amount of the Vacation Allowance, Value of the Listed Holidays and Thrift Savings Deduction for transmittal on a monthly basis.

(c) The monthly transmittal shall cover every employee subject to this Agreement on the payroll for all payroll weeks ending within the calendar month.

(d) The Vacation Allowance, Value of the Listed Holidays, and Thrift Savings Deduction must be paid to all workmen who are directed by the individual Employer to work on jobs outside the jurisdiction of Local Union 6. When men are sent by representatives of Local Union 6 to work for such individual Employer on work outside the jurisdiction of Local Union 6, they do not come under the provisions of this Vacation Allowance, Value of the Listed Holidays and Thrift Savings Deduction, and the contractor will not be required to pay the Vacation Allowance, Value of the Listed Holidays and Thrift Savings Deduction.

(e) The monthly transmittal form and accompanying check is due on the 10th of the month following the end of each calendar month that the report form covers. Payments received by E.I.S.B., Inc. after the fifteenth (15th) of the month are delinquent and are subject to liquidated damages.

(f) Duplicate copies of the monthly transmittal form shall be sent by E.I.S.B., Inc. to (1) the office of the San Francisco Electrical Contractors Association, Inc.; (2) the office of the Local Union 6, International Brotherhood of Electrical Workers; (3) the office of the area administrator for the Health and Welfare Plan, San Francisco; and (4) a financial institution selected by the Labor-Management Committee together with the check covering the transmittal.

(g) It is agreed that timely contributions to the Vacation, Holiday and Thrift Savings Account is essential to the protection of the beneficiaries. The Employer shall pay to the Vacation, Holiday, and Thrift Savings Account of each affected employee an amount equivalent to six percent (6%) for each delinquency.

(h) The Union shall pay for all administrative expenses incurred in the operation of the plan other than those incurred within the individual Employer's own office.

(i) Annual time-off for vacations for each employee subject to this Agreement shall be scheduled once each twelve (12) month period from February 1st, through January 31. The following rules shall apply in the calculation and scheduling of vacations:

(j) Unless mutually agreed otherwise by the Union Representative and the Employer Representative, all employees shall take two (2) weeks' vacation each vacation year, which shall begin on a Monday. The vacation period shall consist of two (2) workweeks of five (5) consecutive workdays each. No additional vacation time off, as such, shall be allowed because of any holiday that may fall within the vacation period.

(k) Any employee whose accumulated vacation allowance is less than ten (10) days standard pay shall be required to take one days vacation for the equivalent of each days vacation pay on the same basis as above.

(l) Not more than twenty percent (20%) of the employees in any shop or on any job shall be granted their vacations at the same time unless agreed to by the Employer.

(m) Employees failing to meet the vacation requirements shall notify the Union in writing before December 30th of each vacation year.

(n) Time off for vacations is not accumulative from one vacation year to the next vacation year.

(o) There shall be an interval of at least three (3) months between a vacation for an employee in one vacation year and his vacation scheduled in the next vacation year.

(p) No vacation time off, as such, will be given in excess of two (2) weeks even though the vacation allowances accumulated may be in excess of two (2) weeks normal pay. On the other hand no employee shall be denied the right to two (2) weeks vacation time off when the vacation allowance accumulated is less than two (2) weeks normal pay.

(q) The following procedure shall be followed in the withdrawal of funds from the financial institution selected by the Labor-Management Committee.

1. At least fifteen (15) days in advance of the date on which it is desired, the vacation will begin, an "Application for Vacation Card" shall be completed setting forth the vacation period as agreed upon in accordance with the rules set forth above. This is to be signed by the current Employer or his authorized representative and by the employee.

2. The employee will take this card to the Local Union office. On the proper space provided on this card, the Business Manager of the Local Union, or his authorized representative, shall sign a statement that the employee is not eligible for employment during the vacation period as specified.

3. The employee may present the completed Application for Vacation Card, at his convenience, to the financial institution selected by the Labor-Management Committee, who will allow him to withdraw all funds on deposit for the calendar year preceding the vacation year during which the vacation is scheduled, except that one dollar ($1.00) shall be retained in the account as long as it is active. The Thrift Savings may be withdrawn only once annually and not be used to extend the vacation periods or holidays provided for elsewhere in this Agreement.

4. No further withdrawals of vacation funds will be permitted until the following vacation year, when a new application for vacation card may be completed.

5. Any employee who leaves the jurisdiction of this Local Union, who has earned an allowance, may collect same on or after February 1st subsequent to the calendar year in which earnings were made, upon written application to the Local Union, together with a signed Application for Vacation Card. The Union shall forward this request to the financial institution selected by the Labor-Management Committee, and his allowance shall be mailed to said employee at the address given in the request.

6. In the event of death of the depositor, the balance on deposit shall be paid to such person or persons entitled thereto upon submission of necessary proof.

7. In lieu of the above withdrawal procedure, an employee may choose to sign a voluntary automatic fund transfer card with the financial institution selected by the Labor-Management Committee which would authorize the automatic transfer of his funds on a quarterly basis to a Savings and Loan Association which is agreeable to the parties to this Agreement and the transferred funds shall be deposited in a similar account with a similar withdrawal procedure as defined above.

Sec. 3. (a) The Employer agrees to deduct and forward to the Financial Secretary of the Local Union, upon receipt of a voluntary written authorization, the additional working dues from the pay of each IBEW member. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

(b) The Employer agrees to deduct and transmit to IBEW-Cope an amount of _____ from the wages of each employee who voluntarily authorizes such contributions on the forms provided for that purpose by IBEW-Cope.

Sec. 4. It is agreed that in accord with the Employees Benefit Agreement of the National Benefit Fund ("N.E.B.F."), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF, the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to (3%) of the gross monthly labor payroll paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his agreement terminated upon seventy-two (72) hours notice in writing being served by the Union, provided the individual employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

Sec. 5. The employer agrees to pay to the Electrical Workers Health and Welfare Trust for San Francisco, for each hour worked by all employees covered by this agreement the sum of nine dollars and thirty-eight cents ($9.38) which shall be used by the Trustees to provide health and welfare benefits for eligible employees and for retired members, who prior to retirement were covered by this or predecessors to this agreement. These payments shall be made monthly by the tenth (10th) of the following month into a Trust Fund, jointly established for this purpose and administered in compliance with Federal and State regulations governing Health and Welfare Plans. Transmittals received after the fifteenth (15th) day of the month are subject to the provisions of Article II, Section 6, of the Health and Welfare Trust Agreement.

Sec. 6. There shall be established a fund known as "The Electrical Industry Fund," which shall continue in operation as long as funds are in this account. When there are no longer any funds in this account the Electrical Industry Funds shall terminate and all sections pertaining to the Trust shall not be applicable.

Every individual Employer shall pay ninety-three and one half cents ($.935) for each hour worked by every employee covered by this Agreement into a trust (as required in Article V, Section 5.16 of this Agreement) created for the purpose of receiving and expending said funds to establish and administer apprenticeship and training programs as provided in the Trust document, jointly administered by the International Brotherhood of Electrical Workers, Local Union 6, and the San Francisco Electrical Contractors Association, Inc., titled "San Francisco County Electrical Industry Apprenticeship and Training Agreement" executed November 8, 1962. Twenty-two cents ($.22) of each ninety-three and one half cents ($.935) contribution shall be transferred to the E.I.S.B. as required in Article VI, Section 6(a). Effective June 1, 2006, the contribution rate shall be ninety-eight and one half cents ($.985). Twenty-two ($.22) of each ninety-eight and one half cents ($.985) contribution shall be transferred to the E.I.S.B. as required in Article VI, Section 6(a).

Sec. 6(a). Every individual employer shall pay the Electrical Industry Service Bureau, Inc. ("E.I.S.B.") twenty-two cents ($.22) per hour worked by every employee covered by this Agreement. One cent ($.01) of the twenty-two cents ($.22) shall be designated as the National Labor Management Committee Contribution (N.L.M.C.C.). These monies will pay

those expenses incurred by E.I.S.B. in collecting delinquent fringe benefit contributions and all other functions performed by E.I.S.B. not charged to one or more of the fringe benefit funds mentioned in Article VI. The payment shall be paid by the tenth (10th) of the following month to the Trustees of E.I.S.B. The payment shall be accompanied by an approved transmittal form. Transmittals received after the fifteenth (15th) of the month shall be delinquent. Liquidated damages of 10% or $20.00 per month, whichever is more, shall be assessed on all delinquent contributions to E.I.S.B. along with interest at the rate allowed by law. Any employer who fails to make payment to E.I.S.B. of its contributions by the 15th of the following month, also shall pay to E.I.S.B. all attorneys' fees and costs, and court costs E.I.S.B. incurs in collecting delinquent contributions, liquidated damages and fringe benefits. In addition, all liquidated damages, attorneys' fees and costs, and court costs paid by any employer who fails to make payment of any fringe benefit contributions shall be paid to E.I.S.B. to defray the cost of collecting delinquent fringe benefit contributions.

Sec. 7. The Employer agrees to pay for a Local Pension Plan six dollars and forty-five cents ($6.45) per hour for each hour worked by all employees working under the terms of this Agreement, except as defined in paragraph (a).

(a) Three dollars and four cents ($3.04) of which shall be contributed to the Money Purchase Pension Plan. These payments shall be made monthly by the tenth (10th) of the following month into the Pension Trust Fund (The Northern California Electrical Workers Pension Trust.) Transmittals received after the fifteenth (15th) day of the month are subject to the provisions of the Electrical Industry Trust Fund, and Health and Welfare Trust Agreement.

(a.1) New apprentices indentured after 6/1/88 shall receive the percent of pension equal to their percentage, beginning with their second year.

| | |
|------|-------|
| 40% | $0.00 |
| 45% | $2.90 |
| 50% | $3.23 |
| 55% | $3.55 |
| 60% | $3.87 |
| 65% | $4.19 |
| 70% | $4.52 |
| 75% | $4.84 |
| 80% | $5.16 |

1     (b) On an annual basis Journeymen may increase the M.P.P.
2  contribution rate by dollar increments and reduce their wage rate
3  accordingly, in accordance with the employee's classification in compliance
4  with Internal Revenue Code Section 401A. The parties to this Agreement
5  shall supply the necessary forms through the E.I.S.B. for the classification
6  designation of employees necessary to accomplish the augmented
7  contribution to the M.P.P.

8     Sec. 8.  Each individual Employer shall contribute an amount not to
9  exceed one percent (1%) nor less than (.2 of 1%) of the productive electrical
10  payroll, as determined by each local Chapter and approved by the Trustees,
11  with the following exclusions:

12     1) Twenty-five percent (25%) of all productive electrical
13  payroll in excess of 75,000 man-hours paid for electrical work in any one
14  Chapter area during any one calendar year but not exceeding 150,000 man-
15  hours.

16     2) One hundred percent (100%) of all productive electrical
17  payroll in excess of 150,000 man-hours paid for electrical work in any one
18  Chapter area during any one calendar year.

19     (Productive electrical payroll is defined as the total wages [including
20  overtime] paid with respect to all hours worked by all classes of electrical
21  labor for which a rate is established in the prevailing labor area where the
22  business is transacted.)

23     Payment shall be forwarded monthly to the National Electrical
24  Industry Fund in a form and manner prescribed by the Trustees no later than
25  fifteen (15) calendar days following the last day of the month in which the
26  labor was performed. Failure to do so will be considered a breach of this
27  Agreement on the part of the individual Employer.

28     Sec. 8.01. The parties agree to participate in the N.E.C.A.-I.B.E.W.
29  National Labor-Management Cooperation Fund, under authority of Section
30  6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a)
31  and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C.
32  §186(c)(9).

33

34  The purpose of this Fund includes the following:

35

36     (1)    to improve communication between representatives of labor
37          and management.

38     (2)    to provide workers and employers with opportunities to study
39          and explore new and innovative joint approaches to achieving
40          organization effectiveness,



(3)     to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process,

(4)     to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the Electrical Construction Industry,

(5)     to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry,

(6)     to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees,

(7)     to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production,

(8)     to engage in public education and other programs to expand the economic development of the Electrical Construction Industry,

(9)     to enhance the involvement of workers in making decisions that affect their working lives, and

(10)    to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Sec. 8.02. The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the N.L.M.C.C., as provided in said Agreement and Declaration of Trust.

Sec. 8.03. Each Employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  The San Francisco Electrical Contractors Association, N.E.C.A., or its designee, shall be the collection agent for this Fund.

Sec. 8.04. If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance.  In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20.00), for each month payment of contributions is delinquent to the Fund, such amount being liquidated

-41-

1  damages, and not a penalty, reflecting the reasonable damages incurred by
2  the Fund due to the delinquency of the payments. Such amount shall be
3  added to and become a part of the contributions due and payable, and the
4  whole amount due shall bear interest at the rate of ten percent (10%) per
5  annum until paid. The Employer shall also be liable for all costs of
6  collecting the payment together with attorneys' fees.
7      Sec. 8.05. Each Employer signatory to the Inside Agreement shall
8  contribute three quarters of one percent (.75%) of the gross productive
9  payroll for all employees working under the terms of this Agreement to the
10  Administrative Maintenance Fund (AMF). The monies are for the purpose of
11  administration of this collective bargaining agreement, grievance handling,
12  and all other management duties and responsibilities in this Agreement. The
13  fund is to be administered solely by the employers.
14
15      The AMF contribution shall be submitted with all other fringe benefits
16  covered in this Agreement and shall be bound by the same delinquency
17  requirements. The enforcement for delinquent payments shall be the sole
18  responsibility of the fund or the employers and not the Local Union. The
19  fund may not be used in any manner detrimental to the Local Union or the
20  IBEW.
21
22
23                      Article VII
24      VARIABLE PENSION CONTRIBUTION
25
26      Sec. 1.1. Class by Industry Experience Levels:
27  There shall be seven (7) classes of employees covered by this agreement.
28  Class is based upon industry experience under the I.B.E.W. Local
29  6/S.F.E.C.A. Inside Wiremen Agreement entered into by the Union and
30  Employers signatory to or bound thereby and the attainment of advanced
31  levels of experience and status within the trade. Applicable terms and
32  conditions of this agreement shall be in accordance with attained class.
33  Application for class designations shall be submitted to the Business
34  Manager/Financial Secretary of the Union, and upon his/her
35  recommendation, class designations shall be granted by the Union's
36  executive board. The Business Manager/Financial Secretary's
37  recommendation shall be based upon the requisite experience/status as
38  outlined below:
39
40

1  damages, and not a penalty, reflecting the reasonable damages incurred by
2  the Fund due to the delinquency of the payments. Such amount shall be
3  added to and become a part of the contributions due and payable, and the
4  whole amount due shall bear interest at the rate of ten percent (10%) per
5  annum until paid. The Employer shall also be liable for all costs of
6  collecting the payment together with attorneys' fees.
7      Sec. 8.05. Each Employer signatory to the Inside Agreement shall
8  contribute three quarters of one percent (.75%) of the gross productive
9  payroll for all employees working under the terms of this Agreement to the
10  Administrative Maintenance Fund (AMF). The monies are for the purpose of
11  administration of this collective bargaining agreement, grievance handling,
12  and all other management duties and responsibilities in this Agreement. The
13  fund is to be administered solely by the employers.
14
15      The AMF contribution shall be submitted with all other fringe benefits
16  covered in this Agreement and shall be bound by the same delinquency
17  requirements. The enforcement for delinquent payments shall be the sole
18  responsibility of the fund or the employers and not the Local Union. The
19  fund may not be used in any manner detrimental to the Local Union or the
20  IBEW.
21
22
23                        Article VII
24            VARIABLE PENSION CONTRIBUTION
25
26      Sec. 1.1. Class by Industry Experience Levels:
27  There shall be seven (7) classes of employees covered by this agreement.
28  Class is based upon industry experience under the I.B.E.W. Local
29  6/S.F.E.C.A. Inside Wiremen Agreement entered into by the Union and
30  Employers signatory to or bound thereby and the attainment of advanced
31  levels of experience and status within the trade. Applicable terms and
32  conditions of this agreement shall be in accordance with attained class.
33  Application for class designations shall be submitted to the Business
34  Manager/Financial Secretary of the Union, and upon his/her
35  recommendation, class designations shall be granted by the Union's
36  executive board. The Business Manager/Financial Secretary's
37  recommendation shall be based upon the requisite experience/status as
38  outlined below:
39
40

A.    Class I employees shall consist of all apprentices.

B.    Class II employees shall consist of all employees who have attained Journeymen status or above. Traveling Journeymen shall be presumed to have Class II status only, unless proof of sufficient experience for a higher class is presented at the time of initial dispatch.

C.    Class III employees shall consist of employees who have attained Journeyman status and who have performed at least one (1) year at the trade at the Journeyman level or above under the terms and conditions of the I.B.E.W. Local 6/S.F.E.C.A. Inside Wiremen Agreement

D.    Class IV employees shall consist of employees who have attained Journeyman status and who have performed at least two (2) years at the trade at the Journeyman level or above under the terms and conditions of the I.B.E.W. Local 6/S.F.E.C.A. Inside Wiremen Agreement.

E.    Class V, VI, VII, employees shall consist of employees who achieved Journeyman status and who have performed at least three (3) years at the trade at the Journeyman level or above pursuant to the terms of the I.B.E.W. Local 6/S.F.E.C.A. Inside Wiremen Agreement.

Sec. 1.1. (a) "Year" for the purposes of applying the terms of 1.1 shall mean the number of hours necessary to achieve one (1) year of vesting credit pursuant to the Northern California Electrical Workers Pension Plan.

Sec. 1.1. (b) For the purposes of applying the terms of 1.1 all hours reciprocated to the Northern California Electrical Workers Pension Plan shall be taken into account in determining years at the trade.

Sec. 1.2. Each employee shall submit to the Business Manager/ Financial Secretary of the Local Union any class change application no later than November 1, of each year. Upon approval by the Union, such class shall be effective January 1. The Union shall notify the employers of the approved class of each employee on or before December 10. In the event no

1   class designation application has been filed by an employee, such employee
2   shall be deemed Class I (if an apprentice) or Class II.
3

4        Sec. 1.3. Class change notifications shall be in writing on an approved
5   form and in accordance with the rules and regulations adopted by the Union
6   and approved by the Association.  Upon notification by the Union to the
7   individual Employer of an approved class change, the individual Employer
8   shall pay wages and fringe contributions at the approved class level unless
9   and until notified by the Union of a class change.  In no event, shall a class
10   change be implemented except by proper notification from the Union, and
11   no more than one (1) class change may be effected during any contract year,
12   and shall be effective as of January 1, provided the Employer receives notice
13   of such change on or before the immediately preceding December 10.
14

15        Sec. 1.3. (a) Wage percentage calculations for Vacation/Holiday/Thrift
16   savings shall be based upon the employee's designated class wage rate then
17   in effect.
18

19        Sec.1.3. (b) Notwithstanding an employee's class designation
20   pursuant to Section 1.1, the N.E.B.F. payment calculations shall be based
21   upon Class II wage rates then in effect.
22

23        Sec. 1.3. (c) Wages for hours worked at the time and one half rate,
24   and/or at the double time rate shall be based upon Class II package rates then
25   in effect.  Contributions to the Money Purchase Pension Plan for hours
26   worked at the time and one half rate, and/or at the double time rate shall be
27   in the amount consistent with the straight time hourly contribution required
28   by the employee's class.
29

30        Sec. 1.3. (d) Wages and fringes for work performed by Journeymen
31   level employees (or above) covered by this agreement outside the
32   jurisdiction of I.B.E.W. Local 6, shall be paid at Class II rates, regardless of
33   an employee's class designation.

## INDUSTRY EXPERIENCE WAGE-FRINGE
## EXAMPLES BY CLASS

|  | Journeyman Wage Rate | Foreman Wage Rate | General Foreman Wage Rate | Money Purchase Pension Contribution |
|---|---|---|---|---|
| Class II | $46.55/hr. | $52.37/hr. | $58.19/hr. | $3.04/hr. |
| Class III | $45.55/hr. | $51.37hr. | $57.19/hr. | $4.04/hr. |
| Class IV | $44.55/hr. | $50.37/hr. | $56.19/hr. | $5.04/hr. |
| Class V | $43.55/hr. | $49.37/hr. | $55.19/hr. | $6.04/hr. |
| Class VI | $42.55/hr. | $48.37/hr. | $54.19/hr. | $7.04/hr. |
| Class VII | $41.55/hr. | $47.37/hr. | $53.19/hr. | $8.04/hr. |

## Article VIII
## SEPARABILITY CLAUSE

Sec. 1. Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

**IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this _23_ day of June 2005**

**LOCAL UNION 6**
**INTERNATIONAL BROTHERHOOD**
**OF ELECTRICAL WORKERS**

**SAN FRANCISCO ELECTRICAL**
**CONTRACTORS ASSN., INC.**

JOHN J. O'ROURKE

THOMAS A. COLEMAN

TIMOTHY J. DONOVAN

NICHOLAS DUTTO

TERRENCE MCKENNA

THOMAS MCCLURE

FRANK S. O'ROURKE

ERNIE ULIBARRI

KEVIN T. HUGHES

MICHAEL GARNER

JEFF HAWTHORNE

CONDITIONALLY
APPROVED
INTERNATIONAL OFFICE I.B.E.W.

JAN 2 4 2006

Edwin D. Hill, President
This approval does not make the
International a party to this agreement.

16

# AGREEMENT ON EMPLOYEE PORTABILITY

## BETWEEN

## THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## AND THE

## NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION

## AGREEMENT ON EMPLOYEE PORTABILITY

This revised agreement, between the International Brotherhood of Electrical Workers ("IBEW") and the National Electrical Contractors Association ("NECA"), shall become effective on January 1, 1997. This agreement shall apply throughout the United States, and, except as provided in paragraph 3, it shall supersede any inconsistent provisions of agreements between Local Unions of the IBEW and Chapters of NECA.

The IBEW and NECA agree as follows:

1. A contractor who is a member of NECA and who is bound by a collective bargaining agreement between one IBEW Local Union and a NECA Chapter may bring up to four bargaining unit employees employed in that Local Union's jurisdiction ("bargaining unit employees") into the jurisdiction of another IBEW Local Union, provided that the contractor is bound by a collective bargaining agreement with that other Local Union covering the work to be performed. No more than four bargaining unit employees may be employed at any one time under this paragraph in the jurisdiction of that other Local Union.

2. A contractor who is a member of NECA and who is bound by a collective bargaining agreement between one IBEW Local Union and a NECA chapter may bring up to two bargaining unit employees per job from that Local Union's jurisdiction into the jurisdiction of another IBEW Local Union to perform specialty work or service and maintenance work, provided that the contractor is bound by a collective bargaining agreement with that other Local Union covering the work to be performed.

3. Notwithstanding the provisions of paragraphs 1 and 2 of this agreement, a NECA Chapter and an IBEW Local Union may agree that a contractor may bring more bargaining unit employees than permitted by those paragraphs into that Local Union's jurisdiction, provided that the contractor meets all of the qualifications described in paragraphs 1 and 2 of this agreement.

4. A contractor bringing bargaining unit employees into a Local Union's jurisdiction pursuant to paragraphs 1 or 2 of this agreement will provide that Local Union, either before such employees begin working or on the first weekday on which such employees work, with the names and social security numbers of the employees and the location and identity of the job on which they will be or are working.

5. In all other respects, a contractor bringing employees into a Local Union's jurisdiction pursuant to paragraphs 1 or 2 of this agreement will comply with all of the terms of the collective bargaining agreement applicable to the work performed.

6.  In times of unemployment in the jurisdiction of a Local Union where the work is to be performed, the traveling contractor shall be allowed to bring in the first two (2) bargaining unit employees. The next two (2) bargaining unit employees shall come from the Local Union where the work is to be performed. The next bargaining unit employee will be from the traveling Local Union, followed by the next bargaining unit employee from the Local Union where the work is performed. This system may continue until the traveling contractor has a total of no more than four (4) bargaining unit employees in the Local Union jurisdiction.

7.  Times of unemployment shall be defined as periods where unemployment exceeds 10% of the bargaining unit employees for a period of three (3) weeks in the Local Union in whose area the work is being performed. Those persons who are on Book 1 and are not available for employment within 48 hours of a request for bargaining unit employees shall not be considered as unemployed. Any questions or interpretations of what constitutes unemployment shall be referred to the IBEW International Vice President and the NECA Regional Director.

8.  The purpose of this agreement is to allow a traveling contractor to bring into another jurisdiction a limited number of bargaining unit employees already on the payroll who are knowledgeable of the contractor's work practices and the customer's requirements for start up and completion of the work to be performed. Any bargaining unit employee being assigned into the jurisdiction of another Local Union under this agreement must have been employed by the inside or outside traveling contractor for a period not less than two (2) weeks immediately prior to traveling to the job where the work is to be performed unless a lesser period is agreeable with the receiving Local Union.

9.  This agreement is intended to apply only to contractors who are members of NECA, and nothing herein is intended to limit or otherwise affect the right of the IBEW or its affiliated Local Unions to bargain with any other person, firm, corporation, or entity with regard to subjects similar or identical to those herein.

10.  This agreement will not apply to any work performed under the Joint National Agreement for Instrument Technicians, the Outside Utility Construction National Project Agreement, the National Teledata Agreement, or any International Specialty Agreement.

11.  This agreement will remain in effect from year to year. Either party may terminate this agreement by providing the other with written notice at least 180 days prior to the next anniversary date of this agreement.

Signed this 20th day of December, 1996.

For the International Brotherhood
of Electrical Workers

For the National Electrical
Contractors Association


J. J. Barry
International President

John M. Grau
Executive Vice President

48

# NOTES

EXHIBIT C

# JOINT BILLING AND ADMINISTRATIVE SERVICES AGREEMENT
## FOR RELATED ENTITIES IN THE
## SAN FRANCISCO ELECTRIAL INDUSTRY

# RECITALS

A.       Each of the entities signatory hereto is a signatory party to or a third party beneficiary

of collective bargaining agreements covering the San Francisco Electrical Industry negotiated by

Local 6, International Brotherhood of Electrical Workers Union, AFL-CIO (hereinafter referred

to as "IBEW Local 6") and the San Francisco Electrical Contractors Association, Inc.

(hereinafter referred to as "S.F.E.C.A.") or an individual employer.


B.       Employers signatory to the agreements described in recital ¶ 1 above are required by

said agreements to make hourly contributions and/or other payments to a number of separate

entities and multi-employer pension and welfare benefit funds.


C.       In order to minimize the administrative and bookkeeping burden placed upon

employers, the signatory parties hereto desire to create through this Agreement a system which

allows an employer to aggregate its contribution obligations, insofar as possible, in a single

check pursuant to a single billing.


D.       In order to minimize the costs and inefficiencies of administration, billing, auditing

and collection services that results from a multiplicity of entities and Trusts separately billing,

auditing, and collecting delinquent contributions and/or providing or contracting for

administrative services, the undersigned desire, insofar as possible, to consolidate these functions

through a single non-profit entity which has been formed for the purpose of providing joint billing and administrative services for the signatories hereto.

E.      Therefore, the parties hereto delegate to the Electrical Industry Service Bureau, Inc. (hereinafter referred to as "EISB"), a non-profit California Corporation formed pursuant to Section 302(c)(9) of the Taft-Hartley Act, the duties hereinafter described.

## **AGREEMENT**

The undersigned entities, in order to achieve the goals set out herein above agree as follows:

1.      EISB shall be responsible to bill, on a monthly basis, for contributions/payments due to the other party to this Agreement pursuant to the collective bargaining agreements described in ¶ A above.  In addition, EISB, through its Board of Directors, shall be responsible to adopt uniform collection policies & procedures and to determine from time to time, interest and liquidated damages to be charged in connection with delinquent payments and/or contributions and to advise individual employers of the same.

2.      EISB shall be responsible in connection with any contribution/payment compliance audit routinely or otherwise ordered by the EISB Board of Directors to include therein an audit of the contributions/payment compliance by the employer to other party signatory hereto. Notwithstanding this provision, any other party signatory hereto may exercise any right possessed by it to audit any employer independently of any audit performed by the auditor for EISB, provided costs of such audit are borne by or become the sole responsibility of such party. In addition, any Trust, Fund or entity signatory to this Agreement may opt out of any such audit by notice to the EISB auditor in advance of the performance of any such audit.

2

3.      In connection with any delinquency with respect to any contributions and/or payments discovered during the course of any audit or pursuant to the joint billing of employers undertaken EISB, it shall be the responsibility of the EISB Board of Directors to take any and all steps necessary up to and including suit in the name of and for and on behalf of the other party signatory hereto in connection with the collection of any contributions and/or payments due pursuant to any collective bargaining agreement and/or any Trust agreement or Plan subject to the terms of this Agreement. To that end the other party signatory to this Agreement authorizes and assigns to the EISB Board of Directors all rights and title to any claim by the party signatory, including the right to enter into settlements of delinquencies on its behalf. In addition, the party signatory hereto assigns to the EISB Board of Directors all liquidated damages and/or interest on such delinquent contributions/payments (other than wages or wage equivalents due directly to employees), interest on any holding account, and any recaptured costs of collection which, but for this Agreement would be due and owing to the other party signatory to this Agreement. The assignor party hereto shall retain an equitable right in an aliquot share of the proceeds of any suit prosecuted or settlement entered into by the EISB Board of Directors pursuant to this assignment.

4.      General expenses in connection with shared billings, collection procedures and collection efforts adopted by the EISB Board of Directors shall be allocated to participating entities, including other party or parties signatory hereto, according to a schedule reasonably based upon service use. Such schedule shall become the current Appendix A applicable to this Agreement upon adoption by the EISB Board of Directors without necessity of a modification or further execution of this Agreement.

5.      Any signatory hereto may also assign to EISB the performance of administrative services in connection with any plan and/or programs of the signatory hereto.  Such administrative services may include, but shall not be limited to those described and/or outlined in Appendix B, attached hereto and incorporated by reference.  Administrative services performed that are common to all signatories shall be billed as general expenses, specialized services such as claims paying in connection with the Health and Welfare Plan shall be billed as special expenses.

6.      Special expenses in connection with the administrative services provided only or substantially only for the other party signatory hereto will be charged against such party and shall not be aggregated with general expenses described in ¶ 4 above.

7.      General expenses shall constitute the actual costs expended in joint billing and collection efforts and not recaptured through the joint collection procedures and shall consist of all audit, accounting, administrative and attorneys fees attributable to billing, delinquency control and collection efforts.  General expenses shall also include accounting, bookkeeping and other general administrative services of EISB performed on behalf of all signatories hereto.

8.      General, joint expenses shall, in the first instance be repaid from recaptured costs of collection, liquidated damages and interest due each participating party as collected during the collection process, and next from any interest due each participating party on any contribution/payment holding account administered by EISB.

(a)      In the event the foregoing sources are insufficient to reimburse EISB for actual costs in connection with this Agreement, the EISB Board of Directors may bill each Trust and/or other party for any such general expenses shortfall in accordance with the schedule set forth in ¶ 4 above.

(b)    In the event the foregoing sources result in revenue in excess of the amount needed to reimburse the EISB for actual costs (including maintenance of a prudent operating reserve) in connection with this Agreement, such excess shall be credited to the accounts of the participating entities in accordance with the formula set forth in ¶ 4.

(c)    The accounting period for determining income and expenses in connection with this Agreement shall be set by the EISB Board of Directors, provided however such accounting period shall not be more than one (1) year with the exception that for the initial period of operation the initial accounting period may exceed one (1) year.

(d)    In order to maintain sufficient liquidity to fund the duties and obligations undertaken pursuant to this Agreement, the EISB Board of Directors shall have the right to require each participating entity to deposit with it a sum determined by EISB to be adequate to maintain operating liquidity. Such deposit shall be held by EISB to the credit of the depositing entity, and shall be returned to such entity, less any amounts due and owing EISB pursuant to this ¶ 8, in the event the participating entity withdraws from this Agreement, or at such earlier time as the EISB Board of Directors may deem such deposit or the amount of such deposit held by EISB to be non-essential to the maintenance of operational liquidity.

9.    Each participating party hereby agrees to and adopts the priorities adopted in the IBEW Local 6 / San Francisco Electrical Contractors Association, Inc. Inside Wire Agreement for distribution of contributions/payments collected pursuant to joint collection efforts in the event such efforts fail to recover the aggregate principal amounts due all participating parties. Said "make whole priorities" are set forth in Appendix C attached hereto. Any change in priorities adopted by the collective bargaining parties shall automatically be incorporated as Appendix C.

10.    Notwithstanding any provision of any Trust Agreement or Plan to the contrary, each participating party to this Agreement adopts the billing and collection procedures adopted from time to time by the EISB Board of Directors. The current billing and collection procedures are attached hereto as Appendix D. The EISB Board of Directors shall exercise any and all rights of the parties hereto to waive or otherwise settle amounts of liquidated damages and interest due and owing pursuant to the billing and collection procedures set forth in Appendix D.

11.    With respect to the ERISA parties signatory hereto, this Agreement in conception and operation is meant to conform to the requirements of ERISA Prohibited Transaction Class Exemption 77-10, which allows related multi-employer employee benefit plans to employ common administrative services so long as the actual costs of such services are shared by each participating plan on a basis reasonably related to each such plan's use of such joint services.

12.    This Agreement may be terminated at any time upon one hundred-eighty (180) days written notice of either party to the other. In the event the one hundred-eightieth (180th) day following notice occurs during a billing period, termination shall take effect on the first subsequent date of any new billing period.

13.    Should any dispute arise between or among any of the participating parties and/or with the EISB Board of Directors regarding the interpretation or application of this Agreement and/ or any Appendix hereto, such dispute shall in the first instance be resolved informally between authorized representatives of the participating party and authorized representatives of EISB. Failing informal resolution of the dispute, any party to the dispute may request binding third party arbitration. The parties shall mutually agree to the appointment of an arbitrator, but in the absence of agreement, an arbitrator shall be selected from a panel of seven (7) arbitrators supplied by the Federal Mediation and Conciliation Service by alternate strikes. The party

entitled to strike first shall be determined by coin toss or any other random method agreed upon by the parties.

In the event a dispute arises regarding the rights and/or obligations of multiple parties to this Agreement and such dispute involves the same or a related transaction(s) or procedure(s), the disputes shall be consolidated, and, in the event all parties fail to mutually agree to a resolution of the dispute(s), same shall be determined by a single arbitrator selected in accordance with this ¶ 13.  In the event the number of parties to a dispute makes it impractical or unfair to select an arbitrator by "striking," the EISB Board of Directors shall select the arbitrator.

This Agreement is entered into this ___ day of June 2007, and shall remain in full force and effect unless terminated as to any party in accordance with ¶ 12 above.

_____
Authorized Representative
of_____

_____
Authorized Representative of EISB, Inc.

# APPENDIX A

## 2006 ALLOCATION OF COMMON ADMINISTRATIVE EXPENSES

### I.    Expenses Attributable to Identifiable Fund or Organization

Expenses 100% attributable to a specific fund or organization should be charged directly to that entity.

### II.    Vacation Fund

The Fund should be charged $1,369.36 per month.  Approximately 34.54 hours per month is spent on behalf of the vacation fund, at $ 39.65 per hour as the average rate.

### III.    National Electrical Benefit Fund
### San Francisco Electrical Contractors Association
### Administrative Maintenance Fund

These organizations are to be charged $ 364.00 per month.  Approximately 10.5 hours per month is spent on behalf of these organizations, at $34.67 per hour as the average rate.

### IV.    Salaries, Employee Benefits, Building Expenses and Reimbursable Office Expenses

All salaries, benefits, building expenses and reimbursable office expenses should be allocated on the following percentages, based upon by a time study of the employee's daily responsibilities:

| Entity | Percentage |
|---|---|
| Money Purchase Pension Plan | 22.64% |
| Defined Benefit Plan | 25.99% |
| Apprenticeship | 5.43% |
| Health and Welfare | 41.22% |
| Long Term Disability | 4.44% |
| Sound & Comm. | 0.28% |

## V.    Collection and Payroll Audit Fees

These costs should be allocated based upon a time study of the employee's daily responsibilities with the exception of NEBF, which is based upon a percentage of the total rate package. The allocations percentages are as follows:

| Entity | Percentage |
|--------|-----------|
| Money Purchase Pension Plan | 20.99% |
| Defined Benefit Plan | 24.10% |
| Apprenticeship | 5.04% |
| Health and Welfare | 38.22% |
| Long Term Disability | 4.12% |
| NEBF | 7.53% |

## VI.    Changes in Allocation Schedule

The allocation of expenses shall be reviewed annually and adjusted when appropriate to reflect actual experience. Any new schedule shall become effective as of the date such new schedule is adopted by the Board of Directors of E.I.S.B.

# APPENDIX B

## SAMPLE ADMINISTRATIVE SERVICES PERORMED BY EISB

This appendix is intended to give a general description of the administrative services that may be provided to signatories to the Joint Services Agreement. It is not intended to describe, in detail, the services to be provided to any particular signatory. Generally EISB will act as the official administrator of each signatory Plan and provide the necessary staff, supervision systems and facilities for the effective administration of each signatory's plan or program, pursuant to the direction of each signatory board or organization and the EISB Board of Directors.

### A.    GENERAL ADMINISTRATIVE SERVICES

1. Maintain and update master files of all employers required to contribute to a signatory's plan or program and current contribution rates for each such employer.

2. Prepare and mail monthly contribution reports and implement delinquency control procedures as needed.

3. In conjunction with plan or program professionals, prepare and file all governmental reports and forms, as well as tax filings.

4. Operate pass through accounting for signatories that use only billing and collection services.

5. Maintain employee work summaries reflecting hours reported, contributions received and annual historical data for each employer and employee by classification or as otherwise required by a signatory plan or program.

6. Apply all eligibility rules in accordance with a signatory's plan or program, and provide information to plan or program participants and beneficiaries.

7. In conjunction with plan professionals, draft and maintain plan documents, program agreements, summary plan descriptions and other documents, including notices to employees, essential or desirable for the delivery of plan or program services to employees and beneficiaries.

8. Pay benefit claims and/or arrange for such claims to be paid by a third party. In conjunction with plan professionals, negotiate and draft all contracts and agreements with signatories' plan or program providers.



9.  Present appeals to the board's of the signatories with appropriate plan documentation and references, as well as recommendations for the disposition of such appeals based upon plan or program provisions.

10. Prepare agendas and materials for signatory board meetings. Prepare and maintain minutes of signatory board and committee meetings, and keep and maintain, as custodian, all organic records, agreements, contracts, insurance policies correspondence, reports and related materials of the signatory Trust, Plan or Program(s).

11. Arrange for and present to the signatory boards for approval all necessary fiduciary insurance, liability and other coverage to protect the signatories from liability for errors and omissions, and other risks associated with the operation of the plans and programs. Arrange for all bonds to protect the signatories and their plan and program assets from potential dishonest acts.

12. Periodically recommend and place into effect, at the direction of the signatories, changes and innovations calculated to streamline administration, improve service to signatory plan participants and reduce costs.

## B.    **ACCOUNTING/BOOKKEEPING**

1.  Maintain general ledgers (reflecting receipts, disbursements and investment activities) and maintain the necessary subsidiary ledgers.

2.  Manage bank accounts, monitor all activity and reconcile each month.

3.  Allocate shared expenses among all signatories. Allocate special expenses as appropriate.

4.  Prepare checks and other documents for signature and/or distribution as required.

5.  Monitor banking arrangements, institutional short term investments and interest rates in order to aid signatories in maximizing interest income and negotiate banking fees. Arrange for the transfer of funds and investments as directed by the signatories or their investment managers and other professionals as delegated by the signatory boards.

6.  Monitor signatory financial status including liquidity requirements, assist professional staff and advise signatories of significant events.

7.  Prepare all pertinent records for annual audits within 60-90 days of the close of the fiscal year.

8.  Issue Form 1099s and W-2s as required by law and/or the operation of a signatory plan or program.



## C.   <u>INFORMATION SYSTEMS AND DATA PROCESSING SERVICES</u>

1. Maintain integrated data processing systems and the required data bases necessary for Trust, Plan and benefits administration, including employer/employee contribution accounting functions, delinquency control, eligibility functions, signatory plan and program financial accounting and controls, plan design, benefits calculations and changes, and internal operating procedures

2. Capture and produce census, claims, experience, financial, statistical and other data necessary to administer a plan or program in accordance with plan documents and to provide the necessary information to monitor and/or to form a basis for change in a plan or program design or benefits.

# APPENDIX C

### MEMORANDUM OF UNDERSTANDING
### BETWEEN IBEW LOCAL 6 AND THE SAN FRANCISCO
### ELECTRICAL CONTRACTORS ASSOCIATION, INC.
### REGARDING PRIORITY OF PAYMENT IN
### THE EVENT OF NON-COLLECTION OF
### PAYMENTS DUE FROM EMPLOYERS
### PURSUANT TO THE:

### INSIDE WIRE AGREEMENT
### STOREKEEPER AGREEMENT

It is the obligation of the parties to the above captioned collective bargaining agreements and/or the third party beneficiary funds to whom contribution and/or other payments are to made by Employers pursuant to the terms of the above agreements to assure timely remittance of such contributions and/or payments. The parties recognize, however, that from time to time circumstances may arise, including, but not limited to, the bankruptcy of an individual employer, which rendered even the most diligent collection efforts insufficient to recover the full principle amounts due and owing each party and/or third party beneficiary creditor.

In order to minimize potential conflict between or among competing parties and/or third party beneficiary creditors in such an event, and to relieve fund trustees from their potential fiduciary obligations to pursue bad debts, the parties hereto agree that when circumstances arise which make improbable or impossible the recovery of all principle sums due that the priority for the allocation of such sums as are recovered shall be as follows:

First: The principle sums due for wages and wage deductions, including vacation, holiday and thrift savings;

1

Second:  The principle sum due as and for money purchase pension plan contributions and/or the 401(k) profit sharing plan;

Third:  The principle sum due as and for Northern California Electrical Workers Pension Plan contributions;

Fourth:  The principle sum due as and for health and welfare benefits contributions;

Fifth:  The principle sum due as and for long term disability benefits contributions;

Sixth:  The principle sum due as and for the San Francisco Electrical Industry Apprenticeship and Training Trust contributions;

Seventh:  The principle sum due as and for E.I.S.B. contributions;

Eighth:  The principle sum due as and for National Electrical Benefit Fund contributions;

Ninth:  The principle sum due as and for the Administrative Maintenance Fund contributions;

Tenth:  The principle sum due as and for National Labor Management Committee contributions.

This Memorandum of Understanding shall be effective from and after June 1, 2005, and shall remain in effect co-incident with the term of the captioned collective bargaining agreements and any renewals or extension thereof unless modified in writing by the parties hereto.

Dated: _____        Dated: _____

_____        _____
John J. O'Rourke,   Bus. Mgr/Fin. Sec.    Thomas A. Coleman, Exec. Mgr. San Francisco
                    IBEW Local 6                               Electrical Contractors Assn.

2

## APPENDIX D

## ELECTRICAL INDUSTRY SERVICE BUREAU COLLECTION POLICIES AND PROCEDURES

Pursuant to the delegation to the Electrical Industry Service Bureau, Inc. ("E.I.S.B.") in the Joint Services Agreement, EISB has promulgated the following policies and procedures applicable to Employer contributions or payments required to be made to the signatories to the Joint Services Agreement.

I.    **EMPLOYER OBLIGATIONS**

   A.    **AMOUNT OF EMPLOYER CONTRIBUTIONS.**    Each Employer shall make contributions or payments in an amount required by the applicable collective bargaining agreement or subscription agreement. Pursuant to such agreements, payments are made to the Electrical Industry Service Bureau, Inc. ("EISB") or its collection agent as may be determined by the EISB Board of Directors.

   Payments shall be accompanied by complete reports on forms furnished or approved by EISB so that the contributions can be allocated accurately. An Employer may be compelled by EISB, by way of subpoena, civil discovery or other legal proceeding, to prepare, submit and file with EISB proper reports for any period for which the Employer has previously failed to file.

   For any reporting period for which an Employer fails to file a report, until the proper report is filed by the Employer and accepted by EISB, the amount due from the Employer for such reporting period shall be deemed to be at least the amount due pursuant to the most recent complete report filed by the Employer covering an equivalent period of time.

   B.    **PROCEDURE FOR PAYMENT.** Payments shall be due and payable at the office of EISB, or at any other place designated by EISB, in such installments and at such times as are required by, the applicable collective bargaining agreement, subscription agreement or

1

duly adopted collection procedures promulgated by the EISB Board of Directors. Each payment or installment shall be accompanied by a contribution report.

C.   **DUE DATE.**  Payments for hours of Covered Employment shall be received by EISB by the "Due Date." The due date shall be that designated in the collective bargaining agreement, subscription agreement or by these duly adopted collection procedures. Contributions/payments shall be deemed delinquent in the event payment is not received on or before the 15th day of the month following the month for which contributions are due. Contributions/payments shall be deemed delinquent in the event payment is not received on or before the 20th day of the month following the month for which contributions are due for Employers reporting on the Electronic Transmittal System for the San Francisco Electrical Industry ("JETS").

D.   **DELINQUENT CONTRIBUTIONS.**  An Employer shall be considered to be delinquent if late payment or underpayment occurs because it (1) fails to submit a contribution report with the full contribution on or before the "due date" described in paragraph C, above; or (2) fails to submit contributions on behalf of all employees for whom contributions are required by the collective bargaining agreement or subscription agreement; or (3) fails to properly compute the contributions according to the applicable contributions formula, or (4) otherwise fails to meet its obligations pursuant to these duly adopted collection procedures or the collective bargaining agreement or subscription agreement.

EISB may, in the event of repeated delinquencies by an Employer, prescribe special rules applicable to such an Employer (and/or related entity), including without limitation, advancing the due date, and/or increasing the bonding requirements specified in the collective bargaining agreement and/or requiring other security against future delinquencies.

Acceptance by EISB of any contributions, and/or the disposition by EISB of the monies received, shall not release or discharge an individual Employer from its contribution obligations under the collective bargaining agreement or subscription agreement for hours worked under such agreement for which no (or an inadequate) contribution has actually been received, notwithstanding any statement, restriction or qualification appearing on any check or other tender of payment or any attachment thereto.

E.    **LIQUIDATED DAMAGES**.  Prompt payment of contributions is essential to the operation of the signatory entities and for the payment of benefits.  It is extremely difficult, if not impossible, to fix the actual damages and expenses which may result from the failure of an Employer to make timely contributions.  If Employers do not make timely payments, Joint Services Agreement signatories incur lost investment opportunities, and incur additional administrative expenses in the form of letters, telephone calls, and other collection expenses. Collection expenses, loss of return on investments, and potential inability to pay benefits constitute damages arising from an Employer's default in making timely payments, and penalize other Employers whose contributions are promptly paid.

As it is difficult and impractical to fix the actual damages accruing as a consequence of a delinquency, payments not timely made or underpayments made to EISB shall be subject to liquidated damages in an amount designated by the EISB Board of Directors as set forth more fully below and shall be assessed on all delinquent contributions or payments due.  An Employer who fails to make payment of its contributions by the due date, shall in addition be subject to pay interest at a rate set by the EISB Board of Directors and all costs of collection, including without limitation, attorney's fees, collection agency fees, accountant/audit fees and court costs.

1.    General Rules Applicable to Liquidated Damages.  If an Employer fails to remit monthly contributions or transmittals timely, in accordance with the deadlines set forth

3

herein, liquidated damages of 20% of the principal owed will be assessed on the principal due with the exception of vacation delinquencies, which will be assessed at the rate of six percent (6%) of the principal amounts due.

2.    Waiver for One Time Delinquency.  If an Employer who was delinquent pays the principle sum prior to the referral of the matter to Collection Counsel, and the Employer has not been delinquent during the previous 12 months, the EISB Chief Administrative Officer ("CAO") may administratively waive the liquidated damages upon a request of the Employer which request sets forth a valid reason for the delayed payment.  Any such waiver shall be reported to the EISB Board at the next Board of Directors meeting following such waiver.

3.    Waiver When Contributions Are Timely Paid But Transmittals Are Late. When an Employer is late in submitting to EISB the Employer contribution transmittal form but the correct amount of principal amounts due have been timely paid, the EISB CAO may waive the Liquidated Damages.  If the Employer repeats this practice during the following twelve (12) month period, another waiver may be granted only if approved by the EISB Board of Directors after the Employer requests such a waiver in writing.

4.    Reduction of Liquidated Damages.  Notwithstanding the liquidated damages policy set forth above, the EISB CAO has discretion to reduce the liquidated damages assessed on a delinquent Employer by no greater than 50% of the liquidated damages owed as an inducement to an Employer for remitting delinquent contributions before the delinquency is referred to Collection Counsel.  Once a delinquency has been referred to Collection Counsel, the EISB CAO may no longer waive any of the liquidated damages assessed against a delinquent Employer.  The Employer may request a waiver of all or a portion of the liquidated damages assessed, provided the Employer does so in writing to the Board.  The EISB Board of Directors,



for good and sufficient cause, may approve waiver of some, all or none of the liquidated damages assessed.

**F.    VACATION WITHHOLDING LIQUIDATED DAMAGES.**

Notwithstanding the above provisions concerning liquidated damages, any liquidated damages assessed on vacation withholdings shall be added to the participant's vacation accounts.

**G.    DAMAGES FOR ELECTIVE CONTRIBUTION ACCOUNTS** To the extent EISB is able to do so, EISB will advance a participant's elective contribution account [ie. 401(k)] when an employer is delinquent transmitting same to the EISB. In the event that EISB advances what would otherwise be a delinquent elective contribution, EISB, by virtue of this Joint Services Agreement, shall become the assignee of the San Francisco Electrical Workers Retirement Savings to the extent of any such delinquent elective contribution and shall be entitled to pursue all rights of the Retirement Savings Plan for EISB's own account, including the principal sum advanced and any liquidated damages, interest and collection costs associated with the assigned claim for delinquent elective contributions due. In the event that EISB cannot advance a participant's elective contributions accounts that have become delinquent for any reason, EISB will allocate to the participant's account whatever portion of liquidated damages and/or interest it collects through the delinquency procedures that may be necessary to make the participant's account whole for lost earnings.

**H.    INTEREST.** Delinquent contributions, liquidated damages and other sums owing shall accrue interest from the date payable until the date paid at a rate of interest established by the Board of EISB consistent with ERISA

1.    <u>No Legal Proceedings.</u>  Interest will be assessed on all delinquencies from the due date. If principal is paid prior to any legal proceedings (i.e. a claim on the Employer's bond, a lawsuit, stop notices, mechanic's liens, etc.), Collection Counsel and the EISB CAO shall have

5

the discretion to waive any interest due. Any such waiver of interest due shall be reported to the EISB Board of Directors at the subsequent Board meeting.

    2.   <u>Legal Proceedings Instituted.</u> If legal proceedings (i.e. a bond claim, a lawsuit, stop notices, mechanic's liens, etc.) are instituted, interest will be assessed from the due date. As part of a settlement, Collection Counsel and the EISB CAO may waive a portion or all of the interest owed, subject to the approval of the EISB Board of Directors.

    **I.**   **COLLECTION ACTIONS.** EISB may institute legal proceedings to collect delinquent Employer contributions, contributions required by applicable laws (such as the Federal Family Leave Act or the National Labor Relations Act), liquidated damages, interest, attorney's fees and other costs of collection. Such proceedings may be instituted in EISB's name on behalf of and as agent for the signatories to the Joint Services Agreement, or the claim may be assigned by the EISB Board of Directors to a third person or entity for collection.

    The Employer shall reimburse EISB or its assignee, for all reasonable attorney's fees, audit fees, costs of attachment bonds, private investigator fees, court costs, collection agency fees, and all other reasonable expenses of whatever nature incurred in connection with such suit or claim, including any and all appellate proceedings therein.

    If an applicable collective bargaining agreement contains provisions relating to collections that specify additional remedies, or obligate the delinquent Employer to greater amounts of liquidated damages, interest, attorney's fees or other charges than those set forth herein, EISB may pursue the additional remedies or impose the greater charges.

    An Employer shall remain liable for the payment of liquidated damages, interest and other charges even if it makes a late payment, in full, of principal, unless such damages are waived by the EISB Board of Directors. The contractual obligation to pay such damages,

interest and other charges accrued to the date the principal amount is paid and shall at all times remain enforceable by EISB pursuant to ERISA and/or § 301 of the Taft-Hartley Act.

**J.    RECORD KEEPING AND AUDITS.**

1.    Record Keeping Requirements.  Each Employer shall maintain such time records, checks, check stubs, quarterly or other pertinent government returns, or such other records relating to employment for which contributions or other payments are required, sufficient (1) to determine whether the Employer has satisfied all obligations to the Joint Services Agreement Signatories and (2) to permit the EISB to comply with all applicable laws.  These records shall be maintained within California for a period of not less than seven years following the end of the calendar year in which the employment occurs.  Notwithstanding this seven year period, EISB may seek contributions prior to such seven year period if the Board of Directors determines it is prudent to do so.

The EISB Board of Directors, or its authorized representatives, may require any Employer to submit to EISB any information relevant to the administration of the Joint Services Agreement Signatories.  Upon notice in writing from the Board of Directors, or an authorized agent or delegate, an Employer must permit an accountant/auditor or other authorized EISB representative to enter upon the premises of such Employer at a mutually agreeable time during regular business hours to examine such books, records, papers or reports as may be necessary to determine whether the Employer is making full and prompt payment of all sums required to Joint Services Agreement Signatories.  Such examination may be undertaken pursuant to a routine payroll audit program, a random audit, or on an individually ordered audit basis.  The records to be made available to the Board of Directors, or its representative, shall include, but not be limited to, individual earnings records for all employees, time cards, payroll journals, payroll check registers, cancelled payroll checks, copies of the Employer's federal, state and local

7

payroll tax reports, reports of employee hours to all other trades and Workers Compensation Insurance reports for all employees, and all other documents reflecting the hours and wages of employees.

Upon the auditor's certification that further records are necessary to complete an audit and with approval by the Board of Directors, any and all such records must be made available by the Employer.

The purpose of such an audit is to determine how much money is owed to the Joint Services Agreement Signatories, if any. The Employer understands that the purpose of the audit would be defeated if it were able to limit the audit in any way, including limiting the audit to the Employees he or it defines as Covered Employees. Therefore, the Employer shall not limit the scope of the audit in any fashion, but must make available all of the aforementioned books and records maintained by it to EISB's office or the EISB auditors.

2.    <u>Cost of the Audit.</u> Prior to conducting an audit, the auditor shall estimate the cost of an audit based upon prior audits of other similarly situated Employers. The audit cost estimate shall be used as a basis of determining whether the cost of the audit shall be borne by the Employer in the event an Employer's audit cost is significantly greater than those of similarly situated Employers. The difference between the estimated and actual audit cost of an Employer whose audit costs substantially exceed the estimate shall be borne by that Employer upon approval of the EISB Board or its designee. Further, the cost of the audit shall be borne by the Employer if a shortage caused by anything other than simple mathematical error is disclosed by the audit (ie. fraud or misrepresentation) or if an expansion of the audit is warranted. The EISB Board or its designee may waive the imposition of the cost of an audit at its discretion. Any audit cost incurred as a result of an Employer's cancellation of an audit, without at least two (2) working days notice to the auditor, or as a result of failing to make all records available within a

reasonable period of time, shall be borne by that Employer and not EISB regardless of the results of the audit.

Any Employer who refuses audit entry shall pay all the legal fees and costs associated with the audit of such Employer, including, but not limited to, the costs associated with obtaining compliance with the audit. If an individual Employer fails or refuses to submit to an audit or confirm an audit appointment, EISB may file an action to compel audit entry without regard to the grievance and arbitration procedures in the collective bargaining agreement(s) to which the Employer is bound.

3.      Random Audits. The Board of Directors has delegated to the EISB auditor the responsibility for performing random audits of payroll contributions. Subject to approval by any appropriate committee of the Board of Directors, random audits shall be performed in the manner recommended by the Auditor.

4.      Collection Counsel/EISB CAO Audit Request. After an account is considered delinquent, Collection Counsel or the EISB CAO shall have the authority to request an audit whenever he or she deems it appropriate.

5.      Director Audit Request. An audit shall also be made upon the approval of the Board of Directors, or upon the written request of the Union or Association Director.

6.      Audit Findings. The Board of Directors has delegated to an auditor the responsibility for performing a random audit of payroll contributions at the beginning of each year. Upon completion of an Employer audit, the auditors shall submit a preliminary audit report to EISB for review. EISB shall review the audit's preliminary findings before the audit is sent to the Employer or EISB Board for approval. After reviewing the preliminary audit report, the EISB CAO may request the auditor to either expand or focus the audit of the Employer. After the appropriate preliminary audit review period and any subsequent follow-up, the auditor shall

9

then prepare a draft audit report for the Employer and the EISB Board of Directors. If the Employer disputes any or all of the audit report, such disputes will be made in writing to EISB. The EISB CAO, the auditor and Collection Counsel shall determine the validity of the Employer's disputes. The auditor shall prepare a report summarizing the Employer's disputes and EISB's response for the EISB Board of Directors to review. The EISB Board of Directors shall have the ultimate authority to determine what amounts, if any, are in dispute and finalize the audit. Once an audit is finalized, EISB shall either bill or refund the Employer as appropriate.

7.    <u>Audit Underpayment Discrepancy.</u> If an Employer's audit determines the Employer underpaid contributions, EISB shall mail a Notice of Discrepancy by first class mail itemizing all amounts due including liquidated damages and interest. If, within a reasonable time, there is no response or payment by the Employer, EISB shall either follow-up with a second billing letter or refer the matter to Collection Counsel. The EISB Collections Office will continue normal monthly billing procedures and will update legal counsel and Board of Directors with periodic reports.

8.    <u>Audit Overpayment Discrepancies.</u> Overpayments for Vacation Withholding or contributions to the Health and Welfare Trust Fund or EISB shall be non-refundable. Contributions to all other Trusts or Funds shall only be refundable to the Employer within thirty-six (36) months of discovery by the Employer or EISB. The return of any such contributions beyond the thirty-six (36) month limitation period shall be at the sole discretion of the EISB Board of Directors upon the Employer's written refund request.

appropriate legal proceedings unless he or she concludes that a delay is in the Joint Services Agreement Signatories best interest or he or she has not yet received adequate information. If legal action is delayed, Collection Counsel will inform the Board of Directors of the delay and provide the reason(s) for the delay. If, however, a union representative or others have knowledge that an Employer is delinquent, and that information is conveyed to the EISB CAO, the delinquent Employer will be referred to Collection Counsel, as soon as the delinquency has been confirmed by EISB. After referral of a delinquent Employer to Collection Counsel, the EISB Collection Office will still continue its normal billing procedures and will update Collection Counsel and Board of Directors with periodic reports.

## III.    TRUST COLLECTION COUNSEL RESPONSIBILITY

A.    **Follow Procedures.** Collection Counsel shall be responsible for following the procedures described herein.

B.    **Periodic Reports/Meeting Attendance.** Collection Counsel shall furnish the Board of Directors with a written status report of any pending delinquency matter for each Board meeting. Additional status reports may be required as requested by the Directors or the Delinquency Subcommittee. Collection Counsel or a representative from his or her office shall attend each Delinquency Subcommittee meeting.

C.    **Seek to Resolve Without Litigation.** Subject to the time periods set forth in these procedures, Collection Counsel shall attempt to settle a delinquency without litigation by first attaching any bonds available to satisfy collection and to use any other similar methods for recovery. Prior to negotiating a final settlement, Counsel shall consult with the EISB CAO, who will report to the Employer and union Board members for approval.

## IV.    CHRONIC DELINQUENCIES

A.    **Special Rules.**  The Board of Directors, any appropriate Committee and/or Collection Counsel may establish special rules for the Employers who are repeatedly delinquent on their Employer contributions, including without limitation, requiring speedier payments, random or periodic audits, establishment of a greater cash bond or such other methods deemed appropriate under the circumstances.

B.    **Exceptions to the Above Procedures.**  The Directors are authorized to make an exception to the procedures set forth herein for Employers who are chronically delinquent. By way of example, the above rules regarding waivers of liquidated damages and interest may be set-aside if determined appropriate under the circumstances.

## V.    NOTICE TO EMPLOYEES

After an Employer is delinquent for one month and it is clear that the Employer will not pay such contributions immediately, the Collections Office shall notify employees of delinquent Employers that their Employer is delinquent and the effect of that delinquency on their pension and health and welfare benefits.

The Collections Office will have discretion on the actual timing of when this notice is sent.  Generally, however, the notice will be sent within 30 days of the period in which an Employer is delinquent (i.e., when contributions due on the 15th of the month are not received, the notice to the employed would be sent by the 15th of the following month).

## VI.    MISCELLANEOUS

A.    **Processing.**  No hours or contributions can be processed until a report is received.  Non-sufficient fund checks require a reversal of hours and contributions for everything other than the Pension Plans [and Health and Welfare Plan (limited to two (2) months)].

13

**B.    Employer Reporting Adjustment.** Are allowed provided they do not affect Vacation Funds or 401(k) monies already withdrawn by the employee.

**C.    Overpayment.** Are checked to determine how they occur and to ensure there is no corresponding amounts due before Employers are notified to take the credit with their next report, or are refunded for the overpayment.

**D.    Write-off Authority.** The Electric Industry Service Bureau shall have the full authority to "write-off" uncollectible amounts which are not prudent to pursue for reasons which shall be stated in the minutes of the EISB.

**E.    Delinquency Priority.** When an Employer is delinquent on any contributions, any subsequent payments made by the Employer after the Employer's delinquency arose shall be applied to the Employer's oldest delinquent principal and then to any liquidated damages and/or interest associated with the oldest delinquent amounts owed before applying any of the subsequent payments made by the Employer after the Employer's delinquency arose to any more recent principal amounts (and liquidated damages and/or interest) owed. For example, if an Employer is delinquent with August contributions, but submits a check that totals the outstanding principal for the August contributions with their September transmittal and contributions, the monies received shall be applied to the August principal, liquidated damages and interest first. Any monies remaining shall then be applied to the principal owed for the September contributions. With the written approval of the EISB CAO, particular monies owed by a delinquent employer may be credited to particular employees on specific jobs. Notwithstanding this paragraph, the EISB Administrator may apply monies received for liquidated damages, interest and collection costs to principal owed on behalf of particular employee's accounts to ensure that a disruption in benefits does not occur; however, those principal amounts and any



liquidated damages or interest owed thereon remain outstanding. The EISB Board of Directors may, in its discretion, waive this priority allocation.

      **F.**    **401(k) Delinquencies.**  In the event that an employer fails to remit employee contributions for 401(k) withholding within one hundred-eighty (180) days, in addition to assessing liquidated damages and interest on behalf of the employee for the contributions owed, EISB will also report the failure to transmit the employee 401(k) contributions to the appropriate state and federal agencies, including, but not limited to, the Internal Revenue Service.

Adopted: _____
          (date)